MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2014 ME 35
Docket:       Oxf-13-133
Argued:       November 21, 2013
Decided:      March 4, 2014

Panel:        SAUFLEY, C.J., and LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

## STATE OF MAINE

v.

## ANDREW J. FREEMAN

SILVER, J.

[¶1]  Andrew J. Freeman appeals from a judgment of conviction in the trial court (*Alexander, J.*) of aggravated attempted murder, Class A, 17-A M.R.S. § 152-A(1)(A) (2013); aggravated attempted murder, Class A, 17-A M.R.S. § 152-A(1)(B) (2013);[1] arson, Class A, 17-A M.R.S. § 802(1)(B)(2) (2013); and burglary, Class B, 17-A M.R.S. § 401(1)(B)(4) (2013).  Freeman also appeals his sentence, arguing that it is excessive and that the sentencing court failed to engage in the proper sentencing analysis.  We affirm the convictions and the sentence.

---

[1]  Count 1 of the indictment alleged that Freeman intentionally attempted to murder Kristen McLeod and that his intention to kill was accompanied by premeditation-in-fact, which is an aggravating circumstance pursuant to 17-A M.R.S. § 152-A(1)(A) (2013).  Count 2 alleged that Freeman intentionally attempted to cause the deaths of Edgar McLeod, Sandra McLeod, and Kristen McLeod.  That the person who committed attempted murder intended to cause multiple deaths is an aggravating circumstance pursuant to 17-A M.R.S. § 152-A(1)(B) (2013).  The sentencing justice considered the two convictions as one for purposes of sentencing.  *See State v. Allard*, 557 A.2d 960, 962 (Me. 1989).

## I. BACKGROUND

[¶2]  On December 6, 2011, seventeen-year-old Kristen McLeod ended her dating relationship with Freeman, who was then twenty-one.  That evening, Freeman appeared at Kristen's grandparents' home, where Kristen also lived, asking to speak with Kristen.  Kristen's grandmother, Sandra, refused to let him into the house and turned him away.  Freeman returned, and Sandra again refused to let him in but did offer to give him a ride back to his apartment due to the cold weather.  Freeman asked her to drop him off at a nearby house instead, telling her that it was the home of his aunt and uncle.[2]  Sandra agreed and dropped him off outside the house around 7:30 p.m.  Around 9:00 p.m., Kristen's grandfather, Edgar, locked the front and back doors.

[¶3]  The following day, Sandra awoke around 5:00 a.m. and heard a noise in the basement.  Believing that there may be a problem with the furnace, she opened the basement door and saw flames.  She woke Edgar and Kristen, and together they were able to put out the fire using pots and pans full of water from the kitchen.

[¶4]  An investigation revealed that two separate fires had been started in the basement.  The first had apparently been when a cloth draped over a tabletop was

---

[2]  Sandra and investigators later learned that Freeman's aunt and uncle actually lived in a neighboring house.  The residents of the house where Sandra dropped Freeman off did not know Freeman, and did not see him that evening.

ignited. The second fire involved a box spring frame that had been spray-painted and scorched but failed to combust.

[¶5] Investigators noted several other things. The words "bye" and "Die Kristen" were spray-painted on the basement walls. The house phones were missing; one was later found in the basement without its battery. Several light bulbs in the basement were missing from their sockets. The thermostat in the basement had been turned up to ninety degrees. Several items from the kitchen, including a jug of milk—on which Freeman's DNA was later found—were found in the basement. The sliding door leading outside from the basement was left open about one half of an inch.

[¶6] Also on December 7, around 6:00 a.m., Freeman's aunt, Rhonda Maher, unexpectedly found Freeman sitting at her dining room table. Freeman told her that he had spent the night helping friends move, and that he had just been dropped off. He told a similar story to investigators later that day, but was unable to provide details like the friends' names or the location of either the house they had moved to or the house they were moving from.

[¶7] On December 8, Maher and her husband found a butane lighter outside their front door. There had been a significant amount of snow in the area where the lighter was found, and the Mahers only discovered the lighter after rain had melted the snow away. They turned the lighter over to the fire marshal after

confirming that it had not come from their own home. Freeman's DNA was found on the lighter.

[¶8] Freeman was indicted on all four counts and was arraigned in March 2012. A trial was held in September 2012. The prosecutor argued to the jury that, after Sandra dropped Freeman off, he returned to the McLeod residence and entered the basement through the sliding door. According to the State's theory, Freeman waited in the basement until everyone in the house had gone to bed, helped himself to food and milk from the kitchen, and then set the fires. Based on the fire marshal's belief that the second fire had been interrupted, the prosecutor argued that Freeman was still in the process of setting the second fire when Sandra awoke, and that he fled through the sliding door in the basement when he heard her get out of bed. The jury convicted Freeman of all four counts.

[¶9] At sentencing, the court heard statements from Edgar and Sandra McLeod as well as several of Freeman's friends and family members. Both the State and defense counsel summarized Freeman's troubled upbringing in foster care, as well as his mental health and behavioral problems, which began when he was a child. The State described Freeman's criminal record and his history of violating protection from abuse orders. Finally, Freeman addressed the court and indicated that he was sorry for going into the McLeods' basement to speak with Kristen that night, and that he would never intentionally hurt anybody.

[¶10]  The sentencing court set the basic sentence for aggravated attempted murder "somewhere in the range of thirty to forty years."  The court then considered aggravating factors, including Freeman's lengthy criminal history and the fact that several young girls had protection orders against him, as well as his mental health history.  Finding no mitigating factors, the court enhanced Freeman's sentence to fifty years as the State had recommended.  Finally, the court concluded that Freeman would need some period of probation to help him readjust to society; thus, it suspended ten years of the fifty-year sentence and imposed a four-year period of probation.  Freeman's sentences on the other counts ran concurrently with the sentence for aggravated attempted murder.[3]

## II.  DISCUSSION

[¶11]  Freeman raises several challenges to the fairness of his trial and argues that his convictions must be vacated.  He contends that the trial court abused its discretion when it denied his motion in limine to exclude evidence that he attempted to put another person's spit in his mouth before submitting to a cheek swab for a DNA sample, and that the State engaged in prosecutorial misconduct by, among other things, intentionally eliciting inadmissible testimony from Kristen regarding her attitude toward the intimate aspects of her relationship with Freeman.

---

[3]  The court imposed a thirty-year sentence for arson and a ten-year sentence for burglary.  Freeman does not specifically contest his sentences for these offenses.

6

We find these arguments to be unpersuasive, and turn to a discussion of Freeman's sentence.

[¶12]  The Maine Constitution requires that all punishments be proportioned to the offense.  Me. Const. art. I, § 9; *see State v. Stanislaw*, 2013 ME 43, ¶¶ 26-28, 65 A.3d 1242.  The sentencing court must engage in a three-step analysis: first, considering only the nature and seriousness of the offense, the court must determine the basic sentence; second, it must set the maximum period of incarceration after considering aggravating and mitigating factors; and third, the court must decide whether to suspend any portion of the sentence, and, if it does so, determine an appropriate period of probation.  17-A M.R.S. § 1252-C (2013); *State v. Hewey*, 622 A.2d 1151, 1154-55 (Me. 1993).

[¶13]  "Our review of sentences is guided by statutorily mandated objectives and factors."  *Stanislaw*, 2013 ME 43, ¶ 18, 65 A.3d 1242 (citations omitted).  The purposes of our sentence review are (1) "[t]o provide for the correction of sentences imposed without due regard for the [statutory] factors[,]" (2) "[t]o promote respect for the law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process[,]" (3) "[t]o facilitate the possible rehabilitation of an offender by reducing manifest and unwarranted inequalities among the sentences of comparable offenders[,] and" (4) "[t]o promote the development and application of criteria for sentencing which are both rational and

just." 15 M.R.S. § 2154 (2013). The factors we must consider are the propriety of the sentence and the manner in which the sentence was imposed. 15 M.R.S. § 2155(1)-(4) (2013).

A.     The Basic Sentence

[¶14]  We review the first step of the sentencing analysis for misapplication of principle. *State v. Dwyer*, 2009 ME 127, ¶ 35, 985 A.2d 469. A defendant convicted of aggravated attempted murder may be sentenced to life imprisonment or to imprisonment for any term of years. 17-A M.R.S. § 152-A(2) (2013). "It is not enough that the members of this [C]ourt might have passed a different sentence, rather it is only when a sentence appears to err in principle that we will alter it." *State v. Hallowell*, 577 A.2d 778, 781 (Me. 1990). We will review any part of the sentence, including the basic term, for an abuse of the court's sentencing power. *State v. Reese*, 2010 ME 30, ¶ 23, 991 A.2d 806.

[¶15]  In setting the basic sentence, the sentencing court must examine "the crime, the defendant's conduct in committing it, and, at its discretion, other sentences for similar offenses." *Stanislaw*, 2013 ME 43, ¶ 21, 65 A.3d 1242. Although it is permissible, and often helpful, for the sentencing court to consider sentences imposed for comparable crimes in determining the basic period of incarceration, neither the sentencing statute nor our precedent requires that it do so. *State v. Nichols*, 2013 ME 71, ¶ 20, 72 A.3d 503.

[¶16]  The sentencing court examined Freeman's crimes and found them to be very serious, noting that Freeman's actions were premeditated and that he attempted to kill multiple victims.  Further, the court observed that the manner in which Freeman attempted to kill the victims would have resulted in a painful and tortured death—possibly causing the victims to be burned alive—had he been successful.

[¶17]  The sentencing court also compared Freeman's conduct with the crimes committed by the defendant in *State v. Fortune*, 2011 ME 125, 34 A.3d 1115, the case which resulted in the only other aggravated attempted murder sentence we have reviewed.  In *Fortune*, we affirmed the defendant's life sentence for his participation in a home invasion during which a ten-year-old girl and her father were attacked with a machete, resulting in "devastating and disfiguring life-long injuries."  *Id*. ¶¶ 8-14.  Although the sentencing court found Freeman's crimes to be extremely serious, it appropriately concluded that they were not as heinous as those committed in *Fortune*, and that they did not warrant the maximum sentence of life imprisonment.  The sentencing court's analysis does not reflect any error in principle in arriving at a basic sentence of thirty to forty years.

B.     The Maximum Sentence

[¶18]  Freeman argues that the sentencing court erred by failing to consider any mitigating factors.  We review this stage of the sentencing analysis for an abuse of discretion.  *State v. Robbins*, 2010 ME 62, ¶ 10, 999 A.2d 936.

[¶19]  The sentencing court explicitly found that there were no mitigating factors.  Although Freeman had no prior felony convictions, he had a long history of misdemeanor convictions, almost all of which were for crimes he committed in the nine-month period immediately preceding the aggravated attempted murder committed on December 6, 2011.  These convictions included (1) theft in March 2011; (2) violation of a protection from harassment order, criminal trespass, harassment by telephone, and violation of a condition of release in November 2011; and (3) violation of protection from abuse order and violation of a condition of release in December 2011.  He had frequently been subject to protection from abuse and harassment orders as a result of inappropriate behavior with other young women he dated; the sentencing court found it particularly troubling that he also had a history of violating such orders.  Finally, the court observed that Freeman had failed to take any significant responsibility for his actions and had demonstrated a lack of sensitivity that suggested his dangerous behavior would likely continue.

10

[¶20] Freeman's argument that the court failed to consider his age, mental health problems, and lack of "serious criminal history" is unpersuasive. The sentencing court considered these facts, but did not find them to be mitigating factors. We note that, even if the court had found mitigating factors to exist, it could have also concluded that the aggravating factors far outweighed the mitigating factors and it would not have been required to reduce the basic period of incarceration. *Id.* ¶ 12. We find no abuse of discretion in the court's determination that the aggravating factors justified enhancing Freeman's maximum sentence to fifty years.

C.     The Final Sentence

[¶21] Freeman argues that the sentencing court abused its discretion by failing to suspend a longer portion of the sentence. Having set the maximum sentence at fifty years, the court suspended ten years of that sentence. The court concluded that a period of probation was appropriate in order to help Freeman reintegrate into society because, even with a long sentence in the range of forty to fifty years, Freeman would likely be released from prison before the end of his life expectancy. The sentencing court committed no abuse of discretion by suspending ten years of Freeman's sentence and imposing a four-year period of probation.[4]

---

[4] There is also the possibility that Freeman will be released years before the end of his forty-year incarceration as a result of good time calculations. In considering what period of probation would be

D.      Proportionality of the Overall Sentence

[¶22]   An important purpose of our sentence review is to "facilitate the possible rehabilitation of an offender by reducing manifest and unwarranted inequalities among the sentences of comparable offenders."  15 M.R.S. § 2154(3). Thus, "we consider the length of a sentence to determine whether it is excessive." *Stanislaw*, 2013 ME 43, ¶ 25, 65 A.3d 1242. In assessing a sentence's proportionality, we first "compare the gravity of the offense with the severity of the sentence." *Id.* ¶ 29 (quotation marks omitted) (alteration omitted). If this comparison "results in an inference of gross disproportionality," we then compare the defendant's sentence with sentences received by other offenders. *Id.* (Quotation marks omitted.)

[¶23]   A jury found beyond a reasonable doubt that Freeman intentionally attempted to murder three people. Although Freeman urges that a more lenient sentence is justified because no one was injured and his actions resulted in only minimal property damage, we cannot overlook the gravity of the offense for which Freeman was convicted and sentenced. We have previously noted that the culpability of a person who commits attempted murder is the same as the culpability of one who commits murder, observing that "[t]he only difference

_____

appropriate, the sentencing court observed that "with a sentence of forty or fifty years . . . reduced for good time, [Freeman] will still be out before his life expectancy is reached. I think, therefore, it will be essential to have a period of probation to help his adjustment back into society."

between attempted murder and murder is the fortuitous circumstance that the victim did not die in an attempted murder." *Fortune,* 2011 ME 125, ¶ 39, 34 A.3d 1115. Unlike *Fortune*, in which the victims suffered devastating and disfiguring life-long injuries, the victims in this case suffered no physical injuries. Although Freeman's sentence is harsh and at the far end of the range of sentences that could be imposed under these circumstances, it does not shock the conscience. *See id.* Comparison of the gravity of the offense and the severity of Freeman's sentence does not result in an inference of gross disproportionality; thus, we need not compare the defendant's sentence with sentences received by other offenders. *See Stanislaw,* 2013 ME 43, ¶ 29, 65 A.3d 1242.

The entry is:

Judgment and sentence affirmed.

---

**On the briefs:**

Jeremy Pratt, Esq., Pratt & Simmons, P.A., Camden, for appellant Andrew Freeman

Norman R. Croteau, District Attorney, and Joseph M. O'Connor, Asst. Dist. Atty., Office of the District Attorney, South Paris, for appellee State of Maine

**At oral argument:**

Jeremy Pratt, Esq. for appellant Andrew Freeman

Joseph M. O'Connor, Asst. Dist. Atty., for appellee State of Maine

Oxford County Superior Court docket number CR-2011-558
FOR CLERK REFERENCE ONLY