MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2021 ME 18
Docket:       Wal-20-103
Argued:       November 17, 2020
Decided:      April 1, 2021

Panel:        GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.
Majority:     GORMAN, HUMPHREY, HORTON, and CONNORS, JJ.
Dissent:      JABAR, J.

## STATE OF MAINE

v.

## SHARON CARRILLO

GORMAN, J.

[¶1]  On February 25, 2018, ten-year-old Marissa Kennedy died after enduring months of physical abuse by her mother, Sharon Carrillo,[1] and Carrillo's husband, Julio Carrillo.  In December of 2019, a jury found Carrillo guilty of the depraved indifference murder, 17-A M.R.S. § 201(1)(B) (2020), of her daughter, and the court (Waldo County, *R. Murray, J.*) later entered a judgment of conviction on the verdict, sentencing Carrillo to forty-eight years in prison.

---

[1] Sharon Carrillo has since changed her name to Sharon Ann Kennedy, but we continue to refer to her as Sharon Carrillo because that was her name at the time of the events at issue and during the trial proceedings.

[¶2]   In this appeal from her conviction and her sentence, Carrillo challenges the court's denial of her motion to suppress statements she made to law enforcement, the jury instructions, the court's denial of her motion for a mistrial, and the court's calculation of both the basic and maximum sentence. We affirm the judgment and the sentence.

## I.  BACKGROUND

[¶3]  Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Ouellette*, 2019 ME 75, ¶ 11, 208 A.3d 399.  Marissa died as a result of heart failure associated with battered child syndrome after suffering months of physical abuse.  On the day of Marissa's death, and again the next day, Carrillo confessed to police that she had participated in the abuse that caused her child's death.  Carrillo was arrested on February 26, 2018, and, in March of 2018, a grand jury for Waldo County indicted her for depraved indifference murder, 17-A M.R.S. § 201(1)(B), a charge to which Carrillo pleaded not guilty.

[¶4]  Carrillo later moved to suppress the statements that she had made to law enforcement officers on February 25 and 26, 2018, on the ground that she did not make those statements voluntarily.  During the two-day testimonial hearing held on that motion, the State presented testimony from the law

3

enforcement officer who first responded to the Carrillo home on February 25, 2018; the detectives who questioned Carrillo; and a neuropsychologist who evaluated Carrillo's ability to voluntarily, knowingly, and intelligently waive her *Miranda* rights. Carrillo testified and also presented testimony from a clinical psychologist who had been asked to evaluate her for criminal responsibility and a forensic psychologist who had been asked to testify about how Carrillo's vulnerability to influence by her husband and the detectives played a role in her confessing. After considering all of the evidence and arguments presented, the court found the following facts, which are supported by competent evidence in the suppression record.

[¶5] On February 25, 2018, Carrillo's husband called 9-1-1 to report that Marissa Kennedy had been found bleeding and barely breathing in the basement of the Carrillo home in Stockton Springs. Law enforcement officers responding to the call found the child already dead. After some nonsubstantive conversations, detectives asked Carrillo and her husband to meet them at a nearby public safety building in order to discuss the circumstances of Marissa's death; Carrillo and her husband agreed and followed the detectives in a separate car. At the public safety building, the detectives conducted three

4

separate interviews: one with Carrillo, a second with her husband, and then the third again with Carrillo.

[¶6]  The first interview with Carrillo lasted around two hours and was conducted in a room with the door closed but not locked.  At the outset of the first interview, Carrillo was informed of her *Miranda* rights, acknowledged that she understood those rights, and then agreed to answer questions.  Carrillo remained calm during the interview and did not appear confused.  When asked to explain what had happened, she "described Julio bringing Marissa upstairs from the basement, after which Marissa started spitting up blood from her mouth."  Carrillo made no inculpatory statements during the first interview and responded in the affirmative when asked whether she felt safe around her husband.

[¶7]  During his interview with the detectives, Carrillo's husband presented a very different version of events.  He reported that he and Carrillo had engaged in regular physical abuse of Marissa.  After hearing from Carrillo's husband, the detectives brought Carrillo back to the interview room.

[¶8]  The second interview with Carrillo lasted approximately an hour.  She was given a second *Miranda* warning and again agreed to talk to the detectives.  During the first portion of this interview, the detectives told her that

her husband had admitted to a series of beatings. Carrillo initially continued to deny any involvement in Marissa's death but soon described actions that she and her husband had taken, implicating both of them in Marissa's death. Although many of Carrillo's responses during the second interview simply confirmed what detectives said, she was able to answer open-ended questions with additional detail. For example, Carrillo admitted that the beatings, which sometimes involved the use of a belt, had begun approximately three months earlier. At one point during this interview, Carrillo gave the unsolicited response, "I feel terrible . . . I killed my own child." At no time between the first and second interviews were Carrillo and her husband alone together.

[¶9] The next day, Carrillo and her husband agreed to be interviewed by the Maine State Police Major Crimes Unit at the barracks in Bangor. At the start of that interview, Carrillo was again provided with a *Miranda* warning and accurately described what she believed each section of the warning meant. In this interview, which lasted less than three hours, Carrillo again made numerous incriminating statements about her role in the abuse of Marissa.

[¶10] In discussing the interrogations and the confessions, the court found that the tone of the interviews was "generally calm and conversational," that Carrillo responded cogently to questioning, and that she became

6

emotionally upset at times but not "to the point that her emotional stability appeared to be in question." The court also found that none of the interrogations was overly long, and there was no evidence of trickery, threats, or promises by the detectives who interviewed her. Despite the testimony suggesting that Carrillo's confessions had resulted from her "acquiescent response style" and cognitive limitations, the court found that Carrillo "had cognitive limitations but was not intellectually disabled" and exhibited no signs that she suffered from major mental illness. Based on these findings and its review of all of the evidence and arguments presented, the court found beyond a reasonable doubt that Carrillo's statements to police were voluntary, and it denied Carrillo's motion to suppress those statements. *See State v. Hunt*, 2016 ME 172, ¶ 17, 151 A.3d 911.

[¶11] The court conducted a nine-day jury trial in December of 2019. Among the defense witnesses called by Carrillo was psychologist Sarah Miller, Ph.D., the director of the State Forensic Service. During her direct examination of Miller, Carrillo focused on the psychologist's assessment of the likelihood that Carrillo's confessions had been false. During the State's cross-examination of Miller, the following exchange occurred regarding inculpatory statements

that Carrillo had allegedly made to her prison cellmate, Shawna Gatto, which Gatto then reported to authorities:

> Q:  And you're aware that Shawna Gatto told the police that Sharon Carrillo, shortly after she was placed under arrest, that she participated in the abuse of Marissa Kennedy?
>
> A:  I recall listening to the interview with Shawna Gatto. That's not the part that stands out the most. I'm sorry, could you repeat the --
>
> Q:  That Sharon Carrillo told Shawna Gatto shortly after she was arrested that she participated in the -- I believe the report said sexual and physical abuse of Marissa Kennedy?
>
> A:  I don't recall that specifically, but there were generally discussions of that nature, yes.

Carrillo objected and moved for a mistrial on grounds that the State had elicited inadmissible hearsay evidence and that the State also acted in bad faith by doing so because "there's no good faith reason to believe that what Shawna Gatto provided is true or even credible."  The court sustained the objection but denied Carrillo's motion for a mistrial, opting instead to instruct the jury, "[Y]ou may recall there was an objection raised as it related to a question or question or two regarding a purported statement by Shawna Gatto that related to a statement allegedly made -- she made involving a statement allegedly made by the defendant to her.  That question and those answers are being stricken and you are being specifically instructed to disregard that question and any such

answer by the witness that related to that topic and to give it no weight whatsoever." While giving its final jury instructions the next day, the court again instructed, "Where there's been an objection which I sustained and ordered you to disregard particular testimony or questions associated with that, that testimony and the questions are no longer evidence and you can give it no weight at all."

[¶12] Among the instructions that Carrillo later requested that the court provide to the jury was one regarding the justification of duress, *see* 17-A M.R.S. § 103-A (2020), and another stating that a victim of domestic abuse cannot be an accomplice to the same course of conduct that led to her abuse, *see* 17-A M.R.S. § 57(5) (2020). The court declined to instruct the jury on either principle.

[¶13] The jury found Carrillo guilty of depraved indifference murder, and the court entered a judgment on the verdict, sentencing Carrillo to forty-eight years in prison and ordering her to pay $6,100 in restitution. Carrillo appealed from her conviction and from the sentence, and the Sentence Review Panel granted her application for review of her sentence. *See* 15 M.R.S. §§ 2115, 2151-2157 (2020); M.R. App. P. 2B(b)(1), 20; *State v. Carrillo*, No. SRP-20-104 (Me. Sent. Rev. Panel Apr. 28, 2020).

## II.  DISCUSSION

### A.    Motion to Suppress

[¶14]   Carrillo first challenges the court's denial of her motion to suppress the statements that she made to investigators on the day of and the day after Marissa's death.  "A confession cannot be admitted in evidence unless the confession was given voluntarily . . . ."  *State v. Kittredge*, 2014 ME 90, ¶ 24, 97 A.3d 106.   When, as here, a defendant seeks to exclude incriminating statements as involuntary, it is the State's burden to establish beyond a reasonable doubt the voluntariness of those statements.  *Hunt*, 2016 ME 172, ¶ 17, 151 A.3d 911.  "[A] confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair."  *Id.* ¶ 21 (alteration omitted) (quotation marks omitted).  We review the court's factual findings in the suppression order for clear error, and we review de novo the court's ultimate determination of voluntariness.  *Id.* ¶ 16.

[¶15]   Carrillo relies primarily on *Hunt*, 2016 ME 172, 151 A.3d 911, to argue that, due to her low IQ combined with the detectives' coercive questioning techniques, her confessions were not made voluntarily.  In *Hunt*, we acknowledged that some individuals may be particularly susceptible to

coercive police tactics. *Id.* ¶¶ 37-38. Contrary to Carrillo's suggestion, *Hunt* does not stand for the proposition that a low IQ alone, without evidence of police coercion or misconduct, renders a confession involuntary. *Cf. id.* ¶¶ 36-43. Cognitive ability is but one of the factors courts must consider in determining whether a confession was voluntary. *Id.* ¶¶ 36-37. We discussed the issue of coercive questioning in *Hunt* because such coercive practices *were* used to question the defendant in that case. *Id.* ¶¶ 4-6, 40.

[¶16] Here, in contrast, the suppression court found that Carrillo had cognitive limitations but that law enforcement used no coercive police tactics in questioning Carrillo—no trickery, threats, promises, or inducements. Although the detectives did use leading questions and did exhort Carrillo to "tell the truth," the court found that there had been no use of any objectionable practices that undermined the fundamental fairness of the criminal justice system.[2] *See id.* ¶¶ 16, 20. The court's factual findings underlying its determination of voluntariness are supported by competent evidence in the

---

[2] We are also not persuaded by Carrillo's suggestion that her experience as a victim of domestic violence precludes the court's finding that her statements were voluntary. Although evidence that a defendant had been the victim of domestic violence may suggest to, or even convince a court that, a confession is not voluntary, the court here was not convinced by Carrillo's assertions, and we do not reweigh that determination. *See State v. Hunt*, 2016 ME 172, ¶¶ 16, 22, 151 A.3d 911.

suppression record, and we discern no error in the court's application of the law to those facts.  *See id.* ¶ 16.

B.    Motion for a Mistrial

[¶17]  While cross-examining Miller, the State asked about inculpatory statements that Carrillo had purportedly made to Gatto.  We agree with Carrillo and the trial court that that evidence was inadmissible hearsay.  *See* M.R. Evid. 801, 802; *State v. Tieman*, 2019 ME 60, ¶ 12, 207 A.3d 618.  Carrillo argues, however, that exclusion of the evidence and the curative instruction were not sufficient and that therefore the court erred by denying her request for a mistrial.

[¶18]  A mistrial is intended to address circumstances in which "the trial is unable to continue with a fair result and only a new trial will satisfy the interests of justice."  *State v. Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121 (quotation marks omitted); *see State v. Frisbee*, 2016 ME 83, ¶ 29, 140 A.3d 1230 ("Ultimately, the decision on whether to grant a defendant's motion for a mistrial comes back to the core principles of fairness and justice; the relevant question for the trial court is whether the trial court is confident that the trial can proceed to a fair and just verdict in the context of the proceedings before it.").  In examining the effect of the trial event at issue, a court must consider

"the totality of the circumstances, including the severity of the misconduct, the prosecutor's purpose in making the statement (i.e., whether the statement was willful or inadvertent), the weight of the evidence supporting the verdict, jury instructions, and curative instructions." *State v. Dolloff*, 2012 ME 130, ¶ 33, 58 A.3d 1032 (quotation marks omitted). Because of its significant effect on the proceedings, "[a] motion for a mistrial should be denied except in . . . rare circumstance[s]," that is, "only in the event of exceptionally prejudicial circumstances or prosecutorial bad faith." *Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121 (quotation marks omitted).

[¶19]  Our review of a trial court's denial of a motion for a mistrial is highly deferential. *State v. Cochran*, 2000 ME 78, ¶ 28, 749 A.2d 1274; *see State v. Hinds,* 485 A.2d 231, 235 (Me. 1984) ("In deciding whether an improper line of questioning requires a mistrial, . . . a trial judge has broad discretion."). "The trial court's determination of whether exposure to potentially prejudicial extraneous evidence would incurably taint the jury verdict or whether a curative instruction would adequately protect against consideration of the matter stands unless clearly erroneous." *Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121 (alterations omitted) (quotation marks omitted).  We review the court's denial

of a motion for mistrial only for an abuse of the court's substantial discretion. *Cochran*, 2000 ME 78, ¶ 28, 749 A.2d 1274.

[¶20]  Carrillo contends that the elicitation of evidence from Miller that Carrillo had confessed to someone other than law enforcement was too highly prejudicial for the trial to have continued.  Throughout this case, Carrillo has argued that her confessions should be seen as unreliable or invalid because they resulted from her cognitive limitations, her fear of her husband, and her suggestibility or acquiescence to authority figures like law enforcement officers.  She maintains that the suggestion that she made the same confession to someone who was not an authority figure and at a time when she no longer needed to fear her husband "struck to the very heart of the case against [her]." In addition, Carrillo contends that this tactic exhibited bad faith by the prosecutor.

[¶21]   The State offered plausible—but ultimately unpersuasive— arguments regarding the admissibility of that evidence, including that it was cumulative of other evidence admitted at trial and that the inquiry to Miller was intended to cause the witness to acknowledge that she had reviewed evidence that suggested that Carrillo's confessions to law enforcement officers were not false.  *See State v. Allen*, 2006 ME 20, ¶ 24, 892 A.2d 447; *In re Soriah B.*, 2010 ME

14

130, ¶ 18, 8 A.3d 1256; M.R. Evid. 703. Whatever the prosecutor's motive or understanding in the moment the question was asked, the trial court found that it was not the result of bad faith by the State, and we have no reason to second guess that determination.

[¶22] Carrillo has also overstated the harm to her defense effort. The State elicited this inadmissible hearsay by asking two questions of one of the forty-three witnesses who testified during the nine days of trial. As the trial court found, Miller's responses to the questions were "at best vague." The brief testimony from Miller regarding Gatto's report of Carrillo's confession was also not the only basis on which the jury could determine that Carrillo's confessions to law enforcement were in fact credible. With regard to her claim that they were false confessions brought about by her domestic violence victimization, for example, there was evidence that Carrillo confessed to the detectives outside her husband's presence, that her husband had no opportunity during the course of Carrillo's interviews to instruct Carrillo on what to say, that Carrillo herself did not appear injured on the day of the child's death or in photographs taken during the months that the child was being abused, that Carrillo did not appear to be afraid of her husband and spoke positively about

her relationship with him, and that Carrillo had denied being a victim of domestic violence.[3]

[¶23]  With regard to Carrillo's claims that she was overly suggestible or acquiescent to questioning by law enforcement officers, there was evidence that she denied some acts and admitted others about which the detectives asked her, she corrected detectives when their information was not correct, she provided information that the detectives did not suggest, and she offered details that the detectives did not already know.  For example, Carrillo admitted to hitting Marissa with a fist, slapping her, punching her, and striking her with a belt, but denied having kicked her or hit her with a mop.  Carrillo was also the first to disclose to detectives how long the abuse had been happening, she was the one who led detectives to where the belt that was used to beat the child was kept, and she led detectives in a demonstration of how some of the abuse occurred.  Carrillo also described her own personal motivations for abusing the child.

---

[3] Of course, we cannot say whether this evidence was credible or what weight it should have been given, as both were for the jury's determination. *See State v. Crossman*, 2002 ME 28, ¶ 10, 790 A.2d 603 ("The fact-finder is also permitted . . . to believe some parts of witness testimony to the exclusion of others, and to selectively accept or reject testimony and to combine such testimony in any way." (quotation marks omitted)).  The point is simply that there was a variety of evidence that could have informed a finding that Carrillo's confessions to law enforcement were truthful, aside from Miller's brief and vague answers to the State's impermissible questions.

[¶24] In addition, contrary to Carrillo's contentions, her defense strategy during the trial was not limited to challenging the reliability of her own confessions; she also argued that there was no physical evidence connecting her to Marissa's abuse or death, no eyewitnesses to her abusing or raising her voice to the child, and no photos or videos that showed her committing any such abuse. Furthermore, Carrillo's confessions to law enforcement were not the only evidence of her involvement in the abuse leading to Marissa's death; the horrific nature of the injuries that Marissa sustained over a lengthy period of time—while in Carrillo's care, and even in Carrillo's presence—alone could have created a reasonable inference of Carrillo's involvement in some of those acts. *See State v. Crossman*, 2002 ME 28, ¶ 10, 790 A.2d 603 (stating that the fact-finder may "draw any reasonable inference that logically flows from the testimony or proved physical facts" (quotation marks omitted)).

[¶25] Moreover, we decline Carrillo's suggestion that we should place so little faith in our jurors. Jurors are presumed to follow instructions, including curative instructions to ignore references to inadmissible evidence. *Dolloff*, 2012 ME 130, ¶ 55, 58 A.3d 1032. Here, the jurors were instructed immediately after the bench conference regarding the cross-examination of Miller that Miller's answers to the State's questions had been stricken from the

record, that they must disregard those questions and answers, and that they must give that portion of the testimony "no weight whatsoever." Then, during the final jury instructions given the next day, the court again informed the jurors to disregard any questions or testimony that they had been instructed to disregard and to give such evidence "no weight at all." We have routinely held that such curative instructions provided by the trial court are sufficient to overcome even significant prejudice from the presentation of inadmissible evidence. *See State v. Nobles,* 2018 ME 26, ¶¶ 18-19, 179 A.3d 910; *see also State v. Tarbox,* 2017 ME 71, ¶ 19, 158 A.3d 957; *State v. Begin,* 2015 ME 86, ¶¶ 27-28, 120 A.3d 97; *Allen,* 2006 ME 20, ¶¶ 23-24, 892 A.2d 447; *State v. Thompson,* 535 A.2d 440, 441 (Me. 1988).

[¶26] The court determined that there was a good-faith basis for the State's question to Miller and that a curative instruction could remedy whatever damage to the fairness of the trial might have resulted. We discern no error or abuse of discretion in the court's determination that the trial could proceed to a fair and just verdict. *See Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121; *Cochran*, 2000 ME 78, ¶ 28, 749 A.2d 1274.

18

## C.     Jury Instructions

[¶27]   Carrillo next contends that the court erred by declining her requests for jury instructions regarding accomplice liability and duress.  We review for prejudicial error the trial court's denial of a request for jury instructions.  *State v. Doyon,* 1999 ME 185, ¶ 7, 745 A.2d 365.  A party can demonstrate that the court erred by failing to give a requested instruction only when the instruction "(1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing; and (4) is not otherwise sufficiently covered in the court's instructions."  *State v. Gauthier*, 2007 ME 156, ¶ 15, 939 A.2d 77.

### 1.     Accomplice Liability

[¶28]   At trial, the State asked the jurors to consider whether it had proved Carrillo guilty of the murder of her daughter either as the primary perpetrator of the murder or as an accomplice to her husband's commission of the murder.  Carrillo argues that the court committed prejudicial error by declining to give the following requested jury instruction: "The defendant is not an accomplice in a crime committed by another person if the defendant was the victim of that crime."

[¶29]  Title 17-A M.R.S. § 57(5)(A), on which Carrillo exclusively relies for her proposed instruction, states, "Unless otherwise expressly provided, a person is not an accomplice in a crime committed by another person if . . . [t]he person is the victim of that crime."  Had the court granted her requested instruction, Carrillo would have relied on it to attempt to persuade the jurors that because she was a victim of abuse by her husband, she could not also be considered an abuser of the child.

[¶30]  We reject Carrillo's sophistic interpretation of section 57(5)(A). Carrillo's interpretation of section 57(5)(A) would require us to conclude that a victim of abuse by an aggressor cannot be held responsible for her own acts in abusing a third person.  The plain language of the statute does not support such an interpretation.  *See State v. McLaughlin*, 2018 ME 97, ¶ 9, 189 A.3d 262 (stating that "[w]e review questions of statutory interpretation de novo" and that we must interpret those statutes to avoid producing absurd or illogical results) (quotation marks omitted)); *State v. Stevens*, 2007 ME 5, ¶ 8, 912 A.2d 1229 ("The first step in statutory interpretation requires an examination of the plain meaning of the statutory language in the context of the whole statutory scheme." (alteration omitted) (quotation marks omitted)).

[¶31] Moreover, we note that section 57(5)(A) was adopted from the Model Penal Code, which explains its applicability using, as examples, "[t]he businessman who yields to the extortion of a racketeer [or] the parent who pays ransom to the kidnapper." Model Penal Code & Commentaries § 2.06 cmt. 9(a) at 323-34 (Am. Law Inst. 1985); *see State v. Crocker*, 435 A.2d 58, 66 (Me. 1981) (noting the Maine Legislature's employment of Model Penal Code language in Maine's criminal statutes). Although we have never had occasion to discuss section 57(5)(A), we could find no—and Carrillo has not identified any—cases from other jurisdictions in which similar statutory language has been held to absolve an abused person for his or her assault or murder of a third person. A person may not avoid accountability for her own criminal acts because she may have been the victim of similar criminal acts perpetrated by another person unless she establishes that she committed her offenses under duress, which we discuss below. *Infra* ¶¶ 32-37. Because Carrillo's proposed instruction does not accurately reflect the law,[4] we conclude that the court properly denied that instruction. *See Gauthier*, 2007 ME 156, ¶ 15, 939 A.2d 77.

---

[4] Obviously, the evidence also did not generate any suggestion that Carrillo—who is still alive—was the victim of depraved indifference murder, the crime with which she was charged. *See* 17-A M.R.S. § 201(1)(B) (2020); *State v. Gauthier*, 2007 ME 156, ¶ 15, 939 A.2d 77. Moreover, even if we accepted Carrillo's interpretation of the statute to refer to a defendant having been subjected to the same "course of conduct" as the victim—of which the language of section 57 contains no mention—viewing the evidence most favorably to Carrillo, there was no evidence generated in

2.    Duress

[¶32]   Next, Carrillo contends that the court erred by determining that the defense of duress was not generated by the evidence and by denying her request for a jury instruction regarding duress.[5]  "To determine whether the defense is generated, we review the record in the light most favorable to the defendant to determine if it would have allowed the jury to find facts to make duress a reasonable hypothesis."  *State v. Sexton*, 2017 ME 65, ¶ 19, 159 A.3d 335 (quotation marks omitted).  We review any factual findings of the court for

_____

the record that Carrillo was subjected to anything like the same course of conduct, that is, the physical abuse, as her daughter.  *See State v. Sexton*, 2017 ME 65, ¶ 19, 159 A.3d 335.

  [5] Carrillo requested the duress instruction contained in Alexander, *Maine Jury Instruction Manual* § 6-57 at 6-115 (2020-2021 ed. 2020), which states,

> Under certain circumstances, a person may be excused from criminal responsibility for acts committed under duress.  A person is not criminally responsible if he is compelled to do an act by threat of imminent death or serious bodily injury to himself [or another person] or by direct physical force.

> However, duress exists only if the force or threat [or circumstances] are such as would have prevented a reasonable person in the defendant's situation from resisting or escaping from the force or threats.

> Because the evidence generates an issue of whether the defendant was acting under duress, the State must prove beyond a reasonable doubt either (1) that the defendant was not acting under duress, or (2) that the force or threat [or circumstances] claimed to have created the duress were not such as would have prevented a reasonable person in the defendant's situation from resisting or escaping from such force or threats [or overcoming the circumstances].

(Alterations in original.)

clear error, and we review de novo the trial court's decisions of law. *State v. Fletcher*, 2015 ME 114, ¶ 12, 122 A.3d 966.

[¶33]  The defense of duress is as set out by statute:

> **1.**  It is a defense that, when a person engages in conduct that would otherwise constitute a crime, the person is compelled to do so by threat of imminent death or serious bodily injury to that person or another person or because that person was compelled to do so by force.
>
> **2.**  For purposes of this section, compulsion exists only if the force, threat or circumstances are such as would have prevented a reasonable person in the defendant's situation from resisting the pressure.
>
> **3.**  The defense set forth in this section is not available:
>
> **A.** To a person who intentionally or knowingly committed the homicide for which the person is being tried;
>
> **B.** To a person who recklessly placed that person in a situation in which it was reasonably probable that the person would be subjected to duress; or
>
> **C.** To a person who with criminal negligence placed that person in a situation in which it was reasonably probable that the person would be subjected to duress, whenever criminal negligence suffices to establish culpability for the offense charged.

17-A M.R.S. § 103-A.

[¶34]  Carrillo contends that, viewed in the light most favorable to her, there was sufficient evidence presented at trial to generate a duress defense,

namely, that her husband subjected her to the same type of abuse as that inflicted on the child; that she was intimidated and dominated by her husband, did not possess her own means of transportation or communication, and was rarely outside her husband's presence; that her husband exhibited an abnormal amount of control over her; and that she was particularly susceptible to manipulation by others. We disagree.

[¶35] We have made clear that "[w]hen the basis for a duress defense is a threat, that threat must be real and specific, and the specific harm that is feared must be imminent." *State v. Gagnier,* 2015 ME 115*, ¶* 16, 123 A.3d 207 (quotation marks omitted). "Further, the effect of the threat must be viewed objectively, such that under section 103-A(2), it would have prevented a reasonable person in the defendant's situation from resisting the pressure arising from the threat." *Id.* ¶ 16 (quotation marks omitted). Thus, "[a] veiled threat of future unspecified harm is not sufficient to raise the defense of duress," *State v. Tomah*, 1999 ME 109, ¶ 19, 736 A.2d 1047 (quotation marks omitted), nor is the feared harm "imminent" when "the threatened person has the opportunity to escape that threatened harm or to seek help or to report the threat to the authorities," *Gagnier*, 2015 ME 115, ¶ 16, 123 A.3d 207 (alterations omitted) (quotation marks omitted).

24

[¶36]  In *Gagnier*, the defendant "presented evidence of long-standing abuse that [her husband] perpetrated against her" and argued that "[her husband] created a context in which her apprehension of danger was heightened and that she felt compelled to comply with [his] instruction." *Id.* ¶¶ 2-12, 20.  Assuming that evidence to be true, we considered whether a duress jury instruction was generated when her husband directed her to take certain illegal actions on his behalf, some of which occurred while he was incarcerated.  *Id.* ¶¶ 2, 7-11, 13-14.  While acknowledging the evidence of a history of abuse and intimidation, we concluded that the defendant failed to present any evidence that she engaged in any criminal acts as a result of any immediate apprehension of harm or danger, i.e., that "she was faced with an actual threat of imminent harm originating with [her abuser], which irresistibly caused her to [commit the crime.]." *Id.* ¶ 20.  We therefore held that such evidence was insufficient to generate a duress instruction, and we affirmed the trial court's decision denying the request for such an instruction. *Id.* ¶ 27.

[¶37]  Here, as in *Gagnier*, the court determined that, although there was evidence presented at the trial from which the jury reasonably could believe that Carrillo was a victim of physical abuse, psychological abuse, and controlling behavior by her husband, there was no evidence that Carrillo was

subjected to any specific threats of imminent harm or force by which Carrillo was compelled to commit the acts that caused Marissa's death. Rather, even when viewed in the light most favorable to Carrillo, the evidence, at most, demonstrates the same type of generalized abusive atmosphere that we determined to be insufficient to generate a duress instruction in *Gagnier. See id.* ¶ 20. Given the absence of evidence of specific imminent harm or evidence of compulsion by force, the court properly declined to instruct the jury on the defense of duress. *See* 17-A M.R.S. § 103-A(1).

D.     Sentence

[¶38] Finally, we address Carrillo's challenge to her sentence. "A person convicted of the crime of murder shall be sentenced to imprisonment for life or for any term of years that is not less than 25." 17-A M.R.S. § 1251 (2017).[6] In fashioning a murder sentence within that range, a court is required to complete two steps: "First, the court determines the basic term of imprisonment based on an objective consideration of the particular nature and seriousness of the crime. Second, the court determines the maximum period of incarceration

---

[6] Title 17-A M.R.S. § 1251 (2017) has since been repealed and replaced, but the new sentencing statute contains the same requirements. P.L. 2019, ch. 113, §§ A-1, A-2 (emergency, effective May 16, 2019) (codified at 17-A M.R.S. § 1603 (2020)); *see State v. De St. Croix*, 2020 ME 142, ¶ 6 n.3, 243 A.3d 880 (noting that a person convicted of a crime "must be punished pursuant to the law in effect at the time of the offense" rather than at the time of sentencing (quotation marks omitted)).

26

based on all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case, including the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest." *State v. De St. Croix*, 2020 ME 142, ¶ 5, 243 A.3d 880 (citations omitted) (alteration omitted) (quotation marks omitted); *see* 17-A M.R.S. § 1252-C (2017).[7]

[¶39]  As mentioned above, *supra* ¶ 28, the State prosecuted Carrillo simultaneously under two theories—as an active participant in her daughter's murder and, alternatively, as an accomplice to the child's murder by her husband.[8]  In its sentencing analysis, the court noted that there was ample evidence presented at the trial to support either theory, and the court therefore determined that, for sentencing purposes, Carrillo "was an active participant in the depraved indifference murder of Marissa Kennedy."  In analyzing the nature

---

[7]  Title 17-A M.R.S. § 1252-C (2017) has since been repealed and replaced; the two versions of the sentencing statute contain the same requirements.  P.L. 2019, ch. 113, §§ A-1, A-2 (emergency, effective May 16, 2019) (codified at 17-A M.R.S. § 1602 (2020)).

[8]  "[I]f a single crime can be committed by multiple means, the jury need not be unanimous in finding which of those means supports its general guilty verdict." *State v. Nguyen*, 2010 ME 14, ¶ 15, 989 A.2d 712.  Thus, the jurors in Carrillo's trial need not have agreed as to whether she acted as an accomplice or principal in the child's death. *See id.* (stating that "an accomplice is guilty of the crime as if he acted as a principal, and a guilty verdict rendered on either theory is thus indistinguishable and each is independently sufficient to support a conviction"); 17-A M.R.S. § 57(1), (2)(C), (3)(A) (2020).  Carrillo does not challenge the sufficiency of the evidence supporting her conviction according to either of the State's theories.

and seriousness of the crime, the court described the almost daily brutal beatings that the child—only ten years old—suffered at Carrillo's hands over a period of months, the dozens of injuries the child sustained, and the humiliation she experienced, much of which Carrillo had described in her own words. During that time, the child endured broken bones; blunt trauma; hemorrhaging; lacerations and abrasions, including to her internal organs; infections; traumatic lesions; intense pain; chronic stress; hair loss; and, ultimately, heart failure. The court then accounted for Carrillo's participation in Marissa's torture as comparatively less egregious than her husband's, noted that Carrillo did not use a particular weapon that her husband had used, did not kick the child, and demonstrated less planning and preparation for these acts— and less involvement in the cover-up for them—than did her husband. The court also considered the range of sentences imposed in ten comparable cases. Based on this analysis, the court declined to impose a life sentence and set the basic term of incarceration at fifty years.

[¶40] In step two of the sentencing, the court considered, as aggravating factors, the effect of Marissa's death on her extended family and Marissa's suffering. The court noted that Marissa "suffered significantly and was subjectively aware of that suffering," including by predicting her own death,

and that Carrillo herself described "the screaming that resulted from Marissa on the occasions of these multiple beatings." As mitigating factors, the court noted Carrillo's lack of any criminal record, the significant degree of family support that Carrillo enjoys, Carrillo's "limited intellectual capacity and functioning," and the low likelihood that she would reoffend. The court concluded that the applicable mitigating factors "somewhat outweigh the aggravating factors" and, on that basis, reduced Carrillo's maximum sentence to forty-eight years in prison. Carrillo challenges both steps of her sentencing.

1.    Basic Sentence

[¶41]   Carrillo first contends that, by setting her basic sentence of incarceration at fifty years, the court determined that she was an active participant in the murder, whereas the jury could have found her guilty based solely on her participation as an accomplice; in doing so, Carrillo argues, the court usurped the role of the jury, in violation of her Sixth Amendment right to have a jury make all findings underlying her conviction. *See* U.S. Const. amend. VI; *State v. Schofield*, 2005 ME 82, ¶¶ 11-12, 22, 895 A.2d 927. We review the basic sentence set by the court de novo for a misapplication of legal principles. *De St. Croix*, 2020 ME 142, ¶ 5, 243 A.3d 880.

[¶42]  As we recently noted in *De St. Croix*, a jury determines, beyond a reasonable doubt, whether the State has proved each of the elements of a crime charged, but "*the sentencing court*—rather than the jury—makes . . . factual findings for sentencing purposes by a preponderance of the evidence based on whatever information the court deems reliable." *Id.* ¶ 11.  Although the Sixth Amendment "encompasses a right to have a fact-finder of [the defendant's] choice, judge or jury, determine beyond a reasonable doubt any specific finding of fact that would result in a sentence enhancement *into a new statutory range*," *Libby v. State*, 2007 ME 80, ¶ 7, 926 A.2d 724 (alteration omitted) (quotation marks omitted), convictions for murder in Maine, as either a principal or an accomplice, all fall within the same range for sentencing purposes, 17-A M.R.S. § 1251; *see* 17-A M.R.S. § 1603(1) (2020).

[¶43]  Here, whether Carrillo acted as a principal or an accomplice in Marissa's murder neither makes any difference to her conviction nor works any change to the statutory sentencing range applicable to that conviction.  Being an "active participant" is not an element of the depraved indifference murder with which Carrillo was charged and of which the jury found her guilty,[9] and

---

[9]  That said, each juror might have found beyond a reasonable doubt that Carrillo did act as principal rather than accomplice, and there was sufficient evidence presented at the trial to support such findings.

the court was bound to sentence Carrillo to twenty-five years to life, whether Carrillo was a principal or an accomplice. *See* 17-A M.R.S. § 201(1)(B); 17-A M.R.S. § 1251; *De St. Croix*, 2020 ME 142, ¶ 11 n.5, 243 A.3d 880; *State v. Nguyen*, 2010 ME 14, ¶ 15, 989 A.2d 712 ("Pursuant to section 57, an accomplice is guilty of the crime as if he acted as a principal, and a guilty verdict rendered on either theory is thus indistinguishable and each is independently sufficient to support a conviction."); *Libby*, 2007 ME 80, ¶ 11, 926 A.2d 724 ("Maine law prescribes a single, finite range of sentences in murder cases, within which a court may impose an appropriate sentence without making any additional specific factual findings."); *supra* n.8. Thus, the Sixth Amendment is not implicated in the court's finding that Carrillo was an active participant in the child's murder.

[¶44] Rather, it was the court's obligation to make its own findings relevant to the sentence, by a preponderance of the evidence, based on whatever information the court deemed reliable. *See De St. Croix*, 2020 ME 142, ¶ 11, 243 A.3d 880 ("Courts have broad discretion in determining what information to consider in sentencing; they are limited only by the due process requirement that such information must be factually reliable and relevant." (quotation marks omitted)). The court's finding for sentencing purposes that

Carrillo was an active participant in her child's murder is amply supported by evidence presented to the court, and the court misapplied no legal principles in making and relying on that finding in fashioning Carrillo's basic sentence. *See id.* ¶ 5.

    2.    Maximum Sentence

[¶45]  Carrillo next argues that the court erred by failing to adequately consider her domestic violence victimization as a mitigating factor in arriving at her maximum sentence.  The court specifically stated that there was evidence of domestic violence in Carrillo's relationship with her husband, but also stated that "that evidence particularly with respect to the domestic violence component was not persuasive in regard to any argument that this defendant was committing the crimes she was committing against Marissa as a result of the physical domestic violence which may have been inflicted upon her at some times by Julio Carrillo."  The court instead weighed that evidence in its consideration of Carrillo's limited intellectual capacity and functioning, which the court did apply as a mitigating factor.  Contrary to Carrillo's argument, the court acted well within its substantial discretion in declining to consider the evidence of a history of domestic violence as a separate mitigating factor. *See De St. Croix*, 2020 ME 142, ¶¶ 5, 16, 243 A.3d 880; *State v. Freeman*,

2014 ME 35, ¶ 20, 87 A.3d 719; *State v. Robbins*, 2010 ME 62, ¶ 12, 999 A.2d 936; *Schofield*, 2006 ME 101, ¶ 15, 904 A.2d 409; *State v. Cookson*, 2003 ME 136, ¶ 42, 837 A.2d 101; *State v. Shortsleeves*, 580 A.2d 145, 150-51 (Me. 1990).

[¶46] In sum, the court misapplied no legal principles in setting Carrillo's basic sentence at fifty years in prison, and it acted well within its discretion in applying and weighing the aggravating and mitigating factors in arriving at Carrillo's maximum sentence of forty-eight years in prison. *See De St. Croix*, 2020 ME 142, ¶ 5, 243 A.3d 880.

The entry is:

Judgment and sentence affirmed.

---

JABAR, J., dissenting.

[¶47] I respectfully dissent because I believe that Carrillo was denied a fair trial as a result of exceptionally prejudicial testimony elicited by the prosecution during the cross examination of the director of the State Forensic Service at the end of a nine-day jury trial.[10]

---

[10] I agree with the Court's ruling on the motion to suppress and, since I believe that Carrillo is entitled to a new trial, I do not address the other issues that the Court discusses.

A.      Mistrial

[¶48]   Carrillo contends that the trial court erred when it denied her motion for a mistrial.[11]   The motion was made in response to the following exchange between the prosecutor and the director of the State Forensic Service regarding an alleged confession that Carrillo made to someone other than law enforcement.

> PROSECUTOR:      And you're aware that Shawna Gatto told the police that Sharon Carrillo, shortly after she was placed under arrest, that she participated in the abuse of [the child]?
>
> MILLER:      I recall listening to the interview with Shawna Gatto.  That's not the part that stands out the most.  I'm sorry, could you repeat the –
>
> PROSECUTOR:      That Sharon Carrillo told Shawna Gatto shortly after she was arrested that she participated in the I believe the report said sexual and physical abuse of [the child]?
>
> MILLER:      I don't recall that specifically, but there were generally discussions of that nature, yes.

[¶49]   "We review a decision denying a motion for a mistrial for abuse of discretion."  *State v. Cochran*, 2000 ME 78, ¶ 28, 749 A.2d 1274.  "We will

---

[11]   The State contends that there was no prejudice to Carrillo because the testimony was merely cumulative of evidence that had already been admitted.  *See State v. Allen*, 2006 ME 20, ¶ 24, 892 A.2d 447.

overrule the denial of a mistrial only in the event of exceptionally prejudicial circumstances or prosecutorial bad faith." *State v. Logan,* 2014 ME 92, ¶ 14, 97 A.3d 121 (quotation marks omitted). "A motion for a mistrial should be denied except in the rare circumstance that the trial is unable to continue with a fair result and only a new trial will satisfy the interests of justice." *Id.* (quotation marks omitted). "Ultimately, the decision on whether to grant a defendant's motion for a mistrial comes back to the core principles of fairness and justice; the relevant question for the trial court is whether the trial court is confident that the trial can proceed to a fair and just verdict in the context of the proceedings before it." *State v. Frisbee*, 2016 ME 83, ¶ 29, 140 A.3d 1230.

[¶50]   Since I agree with the trial court's finding that there was no evidence of prosecutorial bad faith, I will address only whether the leading questions and resulting answers created exceptionally prejudicial circumstances sufficient to warrant a mistrial.

[¶51]   In determining whether the jury's hearing about an alleged confession made to someone other than law enforcement was exceptionally prejudicial, the revelation to the jury must be considered in the context of the trial as a whole.   Carrillo's defense was predicated almost entirely on discrediting the confessions that she made to law enforcement.  From the very

beginning, Carrillo's defense was centered on suppressing the confessions that she made to law enforcement, and then, upon losing the motion to suppress, convincing the jury that the confessions were false. In his opening statement and closing argument to the jury, Carrillo's attorney spent almost all of his time arguing that her confession to law enforcement was a false confession. In his opening statement, he told the jury that the defense would be presenting a psychologist to explain how a defendant could be pressured by law enforcement into falsely admitting to criminal conduct.

[¶52] Carrillo's attorneys presented two expert witnesses who testified about the concept of false confessions—Dr. Michael O'Connell, a forensic psychologist who specializes in false confessions, and Sarah Miller, the director of the State Forensic Service. Dr. O'Connell testified about his evaluation of Carrillo's condition and the role that her mental condition played relative to her confessions. Dr. O'Connell interviewed Carrillo, reviewed her medical records, administered psychological tests to her, and reviewed the four videos of her interviews with law enforcement. As a result of his evaluation, he diagnosed her with three disorders listed in the Diagnostic and Statistical Manual of

36

Mental Disorders.[12] He opined that Carrillo was suffering from a "neurodevelopmental disorder," "major depressive disorder" and "post-traumatic stress disorder."

[¶53] Dr. O'Connell explained the phenomena of false confessions and how Carrillo is at a high risk for giving a false confession. He testified that Carrillo exhibited several individual risk factors, including suggestibility, low intellectual functioning, and depression. He also identified situational risk factors, including her fear of, and the extent to which she felt controlled by, her domestically violent spouse and the use of coercion by the detectives during interrogation. Dr. O'Connell opined that "if we think about the individual risk factors, [and the] situational risk factors, I thought compared to the average individual she would be at risk for making a false confession."

[¶54] The evidence of domestic abuse was a significant factor in Dr. O'Connell's testimony. He testified that in his opinion, there was evidence "consistent with [the] idea that [Carrillo] was involved in a highly abusive, domestically violent relationship." Dr. O'Connell further testified that Carrillo's experience with domestic violence may have been a factor in her confession

---

[12] The Diagnostic and Statistical Manual of Mental Disorders is used by mental health providers and examiners to diagnose individuals with mental disorders.

because "she is fearful of [Julio], she has been controlled by him, and . . . she knows that they had spoken to Julio before speaking to her and [that is] who she's concerned about." Dr. O'Connell testified that in his opinion the domestic violence was the "the primary situational risk factor," and that "the detectives, maybe even not intentionally, leveraged that [by] referencing what Julio had said to them."

[¶55] Carrillo also called, as an expert witness, the director of the State Forensic Service, Dr. Sarah Miller. Dr. Miller has a Ph.D. in clinical psychology and is board certified in forensic psychology. Dr. Miller conducted a criminal responsibility evaluation of Carrillo at the request of the State. Her evaluation of Carrillo included a review of Carrillo's medical and school records, including records from Child Protective Services. In addition to reviewing records, Dr. Miller spent six hours with Carrillo and administered several psychological tests. Finally, she reviewed Dr. O'Connell's testimony, and indicated that she agreed with his conclusion that Carrillo was particularly at risk for making a false confession. Dr. Miller also independently noted some concerns about the possibility that what Carrillo told the detectives may have been a false confession. She further noted that Carrillo had an "acquiescent response style" and that someone like Carrillo would generally be more "likely to acquiesce to

others, particularly authority figures." She testified that there is "a large body of research that actually supports the idea that false confessions are more common than the average lay person would believe." Dr. Miller opined that it is a reasonable hypothesis that Carrillo's confession was a false confession.

[¶56] It was during Dr. Miller's cross examination that the prosecution asked her—and the jury first heard—about the alleged confession that Carrillo made, after her arrest, to a person other than law enforcement. This revelation came at the end of the testimony of the last of forty-three witnesses over a nine-day period. This exchange was the last thing that the jury heard before closing arguments and instructions by the court.

[¶57] Carrillo's confession, as law enforcement acknowledged, was the only direct evidence of her involvement in her daughter's death. There was no DNA evidence, no eyewitness testimony, and no other corroborating evidence establishing Carrillo's conduct.[13]

[¶58] The critical question is whether these statements were so prejudicial, in the overall context of the trial, that the curative instruction

---

[13] The Court states that the horrific nature of the injuries that the child suffered in Carrillo's care "could have created a reasonable inference of Carrillo's involvement in some of those acts." Court's Opinion ¶ 24. The Court, however, points to no direct evidence to support Carrillo's involvement, and at the time of the child's death, the child was also under the care of her father, Julio, who confessed to the murder.

provided by the judge was insufficient to provide Carrillo with a fair trial. *See Frisbee*, 2016 ME 83, ¶ 29, 140 A.3d 1230.

[¶59]  Included as part of the prosecutor's questions regarding Carrillo's alleged confession, was a mention of an admission not only to the physical abuse but also a highly inflammatory reference to sexual abuse, which was not an issue in the case.  This revelation of an alleged confession to sexual abuse, made for the first time at the end of the trial, is by itself exceptionally prejudicial.  Furthermore, during the trial there was no evidence of any sexual abuse perpetrated by Carrillo against her ten-year-old daughter.

[¶60]  No matter what the trial judge said to the jury in the way of a curative instruction, he could not unring the bell or erase what the jury heard. It would be extremely difficult to ignore this exchange, particularly because it involved revelations following leading questions made by an assistant attorney general to the director of the State Forensic Service.  Furthermore, in her answer to the prosecutor's leading questions, Dr. Miller indicated that she listened to the interview with Gatto, who indicated that Carrillo confessed to physical and sexual abuse; this was a reference to much more than hearing a casual statement made by a third party.

[¶61] The primary focus of the defense's case from beginning to end was that Carrillo's confession was a false confession. The testimony of both psychologists, Dr. O'Connell and Dr. Miller, stressed the significance of coercive interrogation by authorities and how someone with Carrillo's individual and situational risk factors would be subject to suggestibility by strong authority figures, such as law enforcement. A confession to another woman, who was not a member of law enforcement, is exceptionally damaging to this defense and blows a hole in the expert opinions supporting Carrillo's argument that law enforcement coerced her into giving false confessions. It is apparent that the prosecutor's questions to Miller were an attempt to discredit the defense theory that Carrillo made a false confession to law enforcement. The prosecutor told the trial court that the alleged confession "goes to the basis of the opinion." If the prosecutor wanted to use the alleged confession to discredit the expert's opinion, then he should have asked Miller a hypothetical question as to whether a confession to someone other than a law enforcement officer would change her opinion that it was a reasonable hypothesis that Carrillo's confession was a false confession. The prosecutor would then be in a position to call Gatto in rebuttal to testify to the alleged confession. The prosecutor's

improper attempt to discredit the opinion of an expert witness put before the jury evidence that was clearly inadmissible.

[¶62] Of course, if the State thought that the alleged confession by Carrillo to Gatto was significant, they could have called Gatto as a witness at trial, where she would have been subject to cross examination. Gatto's direct testimony as to Carrillo's confession would be admissible, both as direct evidence against Carrillo and as a rebuttal to the expert witness's testimony presented by the defense. Because the prosecutor did not call Gatto as a witness, the questions and resulting answers were improper and exceptionally prejudicial. Although there is no evidence that the prosecutor was acting in bad faith, he was certainly negligent in his attempt to discredit an expert's opinion by allowing this inadmissible evidence to be revealed to the jury. He should have known that this evidence of an alleged confession was explosive evidence and that it should have been brought to the trial court's attention prior to the questioning.

[¶63] In conclusion, the jury heard exceptionally prejudicial testimony that directly undermined the primary theory of Carrillo's defense. *See State v. Goodrich*, 432 A.2d 413, 418-419 (Me. 1981). Furthermore, the reference to Carrillo's alleged confession of sexual abuse perpetrated against her

42

ten-year-old daughter is, on its own, exceptionally prejudicial.  The issue before us is whether Carrillo received a fair trial, not whether she is guilty of the crime. Given the exceptionally prejudicial nature and timing of the testimony, I believe that Carrillo did not receive a fair trial.

[¶64]  Because I believe that the court abused its discretion in declining to grant a mistrial, I would vacate and remand for a new trial.

---

Laura P. Shaw, Esq., and Christopher K. MacLean, Esq. (orally), Camden Law LLP, Camden, for Appellant Sharon Carrillo

Aaron M. Frey, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Waldo County Unified Criminal Docket docket number CR-2018-146
FOR CLERK REFERENCE ONLY