MAINE SUPREME JUDICIAL COURT                               Reporter of Decisions
Decision:    2022 ME 34
Docket:      Cum-21-413
Argued:      May 9, 2022
Decided:     June 21, 2022

Panel:       STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, and LAWRENCE, JJ.*

# IN RE WEAPONS RESTRICTION OF J.

JABAR, J.

[¶1]  J. appeals from a judgment entered by the District Court (Portland, *Kelly, J.*) extending a weapons restriction placed on J. because J. presents a likelihood of foreseeable harm.  On appeal, J. argues that Maine's weapons restriction statute, a Yellow Flag law,[1] 34-B M.R.S. § 3862-A (2022), is unconstitutional because it conflicts with article I, section 16 of the Maine Constitution; Maine's weapons restriction statute is unconstitutionally void for vagueness; the court's decision to extend the initial weapons restriction order was not supported by clear and convincing evidence; the court erred by failing

---

\* Although Justice Humphrey participated in the appeal, he retired before this opinion was certified.

[1] Yellow Flag laws permit law enforcement to petition the courts for an order allowing law enforcement to temporarily seize firearms from individuals who may be in danger of hurting themselves or others. Yellow Flag laws require an opinion from a medical practitioner that the individual represents a danger to himself or others.  Red Flag laws also permit law enforcement to petition the courts for an order, but without the requirement of an opinion from a medical practitioner.

2

to make factual findings in its order extending the weapons restriction; and there was prosecutorial misconduct. We affirm.

## I. BACKGROUND

[¶2] We draw the following facts from the evidence presented at trial, viewed in the light most favorable to the trial court's judgment. *See State v. Sasso*, 2016 ME 95, ¶ 2, 143 A.3d 124.

[¶3] On the night of September 8, 2021, J. was intoxicated and upset because he was going to euthanize his dog the next morning, he had recently learned his mother was going to move in with his financially abusive brother, and his niece had just died of a drug overdose. He came out of his bedroom in an agitated state carrying a handgun and told his girlfriend that he needed to go outside for a few minutes. After J.'s girlfriend took the handgun away from him, J. came out of his bedroom with another handgun, which she also took from him. J.'s girlfriend could not calm him down, so she called 9-1-1. J.'s girlfriend was "afraid that he was either going to hurt himself or [that he] might damage something." She was also afraid that J. was going to kill himself.

[¶4] During the nearly twenty-minute 9-1-1 call,[2] J. repeatedly tried to get back into his bedroom to retrieve more firearms but was blocked by his

---

[2] A recording of this call was admitted in evidence and portions were played for the trial court.

girlfriend.  He ranted that he was going to kill any police officers who came to his home.  When the dispatcher asked whether J. had any more guns J. apparently overheard the question[3] and replied "Many . . . Many."  J. also grabbed two kitchen knives: a fifteen- to sixteen-inch-long serrated bread knife and a meat knife.  While the dispatcher remained on the phone with J.'s girlfriend, J. made numerous threatening statements, including, "If you come to my house, I will fucking kill you"; "I will fucking kill the first cop that shows up here!  Let's do this!  J.'s ready!"; and, "The first fucking cop to come to my house is a dead motherfucker."

[¶5]  J. left the house while his girlfriend continued to speak to the dispatcher.  When several sheriff's deputies arrived at the home, J. was standing in the driveway armed with two knives.  The deputies approached and repeatedly asked him to drop the knives.  J. did not drop the knives and began slowly walking down the driveway toward the deputies.  The deputies shot J. with two less-than-lethal rounds, but these had limited effect; a third shot, to his groin, finally caused him to drop the knives, and the deputies were able to take him into custody.

---

[3]  Based on the recording, it appears that for part of the call J. was able to hear the dispatcher's questions to J.'s girlfriend.

4

[¶6]   During the time that officers took him into custody, J. remained agitated and continued to threaten the police.  When asked what he intended to do with the guns, J. said "take care of business," added that it was not the deputy's business, and stated that, if J. wanted to shoot himself, he could.  He calmed down on the way to Maine Medical Center but became agitated again when he arrived, threatening to kill his girlfriend.

[¶7]   While J. was in protective custody,[4] 34-B M.R.S. §§ 3862, 3862-A(1)(J), (2) (2022), a doctor assessed him for approximately six hours, describing him as "possibly mildly intoxicated" and "very belligerent towards the law enforcement officers and the medical staff."  Based on this assessment, reports from the sheriff's deputies,[5] and medical records indicating that he had previously been belligerent toward medical staff, the doctor completed a written assessment that stated that J. was "a mentally ill person within the meaning of 34-B M.R.S. § 3801(5)" and that he "pose[d] a likelihood of

---

[4]  34-B M.R.S. § 3862 allows a law enforcement officer to take a person into protective custody, after which the officer must "deliver the person immediately for examination by a medical practitioner," when that officer has "probable cause to believe that a person may be mentally ill and that due to that condition the person poses a likelihood of serious harm as defined in section 3801."

[5]  "[T]he law enforcement officer shall provide to the medical practitioner the information that led to the protective custody . . . ."  *Id.* § 3862-A(2)(A).

foreseeable harm within the meaning of 34-B M.R.S. § 3862-A." *See* 34-B M.R.S. § 3862-A(2)(B).

[¶8]  On September 9, 2021, a deputy applied to the court for an "endorsement" of the doctor's assessment pursuant to section 3862-A(3) authorizing law enforcement to notify J. that he was required to surrender his weapons and was prohibited from possessing any weapons.  Attached to the application was a statement of probable cause and the written assessment by the doctor, as required by the statute.  The court (*Woodman, J.*) endorsed the application, thereby prohibiting J. from possessing dangerous weapons pending a judicial hearing.  *See id.* § 3862-A(1)(C), (4)(A).  On September 10, 2021, the State filed a petition to extend the restriction for a period of up to one year, and a hearing was scheduled for September 22, 2021.  *See id.* § 3862-A(6)(A).

[¶9]  During the hearing, which is governed by 34-B M.R.S. § 3862-A(6), the court (*Kelly, J.*) heard testimony from J.'s girlfriend, one of the deputies who took J. into custody, the evaluating doctor, and J.  J. was represented by counsel. *See id.* § 3862-A(6)(A).  In his testimony, J. admitted the events of the night.  He testified that his dog had since been euthanized, that he would never hurt his girlfriend or the police, and that this was his first interaction with the police

6

since the 1990s. However, he also testified that he had neither stopped drinking nor sought mental health treatment and that the issues surrounding his brother and mother were still ongoing. He testified that the lesson he learned the night of September 8, 2021, was "[n]ever call 9-1-1."

[¶10] The court entered a written order on September 22, 2021, extending the restriction to September 22, 2022. The court used a form order and selected the box indicating that "pursuant to 34-B M.R.S. § 3862-A(6)(D), the Court finds that there is clear and convincing evidence to continue or extend the initial weapons restriction order." Although the form order provided a space for the court to describe the evidence upon which the decision was based, the court left this portion of the form blank. Neither party requested additional findings under M.R. Civ. P. 52(a). As required by statute, the court also scheduled a hearing for August 3, 2022, forty-five days before the expiration of the order, to determine whether the order would be extended further.[6] *See* 34-B M.R.S. § 3862-A(6)(D)(3). J. timely appealed. *See* 14 M.R.S. § 1901 (2022); M.R. App. P. 2B(c)(1).

---

[6] The order set the hearing date for August 3, 2022, which is fifty days before the date that the order expires. The statute, however, requires that the hearing be held "within 45 days prior to the expiration of the order." 34-B M.R.S. § 3862-A(6)(D)(3).

## II. DISCUSSION

[¶11]  J. raises five claims on appeal: (1) section 3862-A violates article I, section 16 of the Maine Constitution; (2) section 3862-A is unconstitutionally vague; (3) the extension of the weapons restriction was not supported by clear and convincing evidence; (4) the court erred by failing to make factual findings when it extended the weapons restriction; and (5) during closing arguments, the prosecutor committed misconduct.

### A.     Constitutionality under the Maine Constitution

#### 1.     Article I, Section 16

[¶12]   We review questions of constitutional interpretation de novo. *State v. Reeves*, 2022 ME 10, ¶ 42, 268 A.3d 281.  The party "challenging the constitutionality of a statute bears a heavy burden of proving unconstitutionality[,] since all acts of the Legislature are presumed constitutional." *Bouchard v. Dep't of Pub. Safety*, 2015 ME 50, ¶ 8, 115 A.3d 92 (quotations marks omitted).  When making a facial challenge to a statute, the party "must demonstrate that 'no set of circumstances exists under which the [statute] would be valid.'" *Guardianship of Chamberlain*, 2015 ME 76, ¶ 10, 118 A.3d 229 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  To prevail against the presumption of constitutionality, "the party challenging the statute

8

must demonstrate convincingly that the statute and the Constitution conflict."
*Bouchard*, 2015 ME 50, ¶ 8, 115 A.3d 92 (alterations and quotation marks
omitted). Finally, "all reasonable doubts must be resolved in favor of the
constitutionality of the statute." *Id.* (quotation marks omitted).

[¶13] Article I, section 16 of the Maine Constitution provides, "Every
citizen has a right to keep and bear arms and this right shall never be
questioned." This section was amended in 1987, when the people of Maine
voted to remove "for the common defense" from the original provision. *See
State v. Brown*, 571 A.2d 816, 816 (Me. 1990). This was done "with the apparent
intent of establishing for every citizen the individual right to bear arms, as
opposed to the collective right to bear arms for the common defense." *Id.*

[¶14] We have previously held that this section of the Maine Constitution
does not give an absolute right to bear arms. *Id.* at 817-18. Further, article I,
section 16, like the rest of the Maine Constitution, is subject to article IV, part 3,
section 1 of the Maine Constitution, which grants the Legislature "full power to
make and establish all reasonable laws and regulations for the defense and
benefit of the people of this State, not repugnant to this Constitution, nor to that
of the United States." Me. Const. art. IV, pt. 3, § 1; *accord Brown*, 571 A.2d at
820. It is "settled law" that article IV, part 3, section 1 gives the State "'police

power' to pass general regulatory laws promoting the public health, welfare, safety, and morality." *Brown*, 571 A.2d at 820. However, the regulation of constitutional rights through the State's police powers must be "reasonable," meaning that the regulation must have "a rational relationship to the intended goals." *Id.* (quoting *Nat'l Hearing Aid Ctrs., Inc. v. Smith*, 376 A.2d 456, 460 (Me. 1977)).

[¶15] When applied to a law that impacts the right to bear arms protected by the Maine Constitution, we look for a rational relationship between the statute impacting that right and "the legitimate state purpose of protecting the public from misuse of firearms." *Brown*, 571 A.2d at 820. For example, notwithstanding article I, section 16, we have upheld firearm restrictions for convicted felons. *Id.* at 819-21; *Bouchard*, 2015 ME 50, ¶ 11, 115 A.3d 92.

### 2. Legislative authority

[¶16] J. argues that any law passed impacting the right to bear arms—such as Maine's Yellow Flag law—following the 1987 amendment to article I, section 16 of the Maine constitution, is unconstitutional. J. argues that the right to bear arms is absolute under the Maine Constitution and cannot be subject to

any regulation passed after the 1987 amendment to the Maine Constitution. We reject this argument for several reasons.

[¶17]  First, in *Brown* we stated that "[i]n *both its original and amended forms*, section 16 appears in the same constitution as article IV, part 3, section 1, giving the legislature 'full power to make and establish all reasonable laws and regulations for the . . . benefit of the people of this State . . . .'" *Brown*, 571 A.2d at 820 (emphasis added).  Second, as discussed above, the history of the amendment indicates that, pursuant to the statute, the Attorney General published a statement about the proposed amendment explaining

> [i]n proposing the amendment, several legislators formally expressed their understanding and intention that the proposed personal right [to bear arms] . . . would be subject to reasonable limitation by legislation enacted at the state or local level.  The Attorney General has issued an opinion to the same effect.
>
> . . .
>
> A "YES" vote favors establishing a personal constitutional right to keep and carry weapons, subject to reasonable regulation*.*

*Id.* at 818 (emphasis omitted).

[¶18]  It is apparent from the legislative history of the amendment that the Legislature intended that one type of reasonable limitation on this right would be one based upon the mental health of a citizen.  *See* L.D. 651, Statement of Fact (113th Legis. 1987) ("[This amendment] will not affect current laws

regarding . . . people who are mentally unstable."); Comm. Amend. A to L.D. 651, No. H-230, Statement of Fact (113th Legis. 1987) ("It is the intent of this amendment to allow the State to continue to restrict the right of . . . mentally incompetent persons to bear arms."). Since 1987, no changes have been made to the Article IV, Part 3, Section 1 of the Maine Constitution that would impact the Legislature's ability to legislate on these matters.

[¶19] Although the Legislature can legislate on these matters, the legislation still must be reasonable, which requires that "the purpose of the enactment be in the interest of the public welfare and that the methods utilized bear a rational relationship to the intended goals." *Nat'l Hearing Aid Ctrs., Inc.*, 376 A.2d at 460. The purpose of section 3862-A is to promote public safety, and its provisions bear a rational relationship to that goal. *See An Act to Enhance Personal and Public Safety by Requiring Evaluation of and Judicial Hearings for Persons in Protective Custody Regarding Risk of Harm and Restricting Access to Dangerous Weapons: Hearing on L.D. 1811 Before the J. Standing Comm. on Jud.*, 129th Legis. (2019) (testimony of Senator Lisa Keim) ("This legislation aims to strike a balance between protecting the public and individuals from a person likely to cause harm, while at the same time

12

safeguarding that person's constitutional rights and their right to due process.").

[¶20] The statute also provides procedural due process. "The two essential elements of procedural due process are notice and an opportunity to be heard." *Doe v. Tierney*, 2018 ME 101, ¶ 17, 189 A.3d 756. Here, the law requires that the person restricted by an order receive notice "as soon as practicable, but no later than 24 hours" following the initial judicial endorsement of the medical provider's assessment. 34-B M.R.S. § 3862-A(4)(B). The statute also provides for multiple hearings where due process is afforded, including a hearing within fourteen days of the initial restriction where the restricted person is represented by counsel and the State must prove by clear and convincing evidence that the person "presents a likelihood of foreseeable harm." *Id.* § 3862-A(6)(A), (B). The law also allows for a restricted person to "file one motion for dissolution during an extended restriction." *Id.* § 3862-A(6)(D)(4).

[¶21] For these reasons, we conclude that Section 3862-A does not violate article I, section 16 of the Maine constitution.

**B.     Vagueness challenge**

[¶22]  J. argues that the terms "likelihood of foreseeable harm" and "in the foreseeable future" are vague and imprecise.  "In a void-for-vagueness challenge, we do not analyze the statute to ascertain if it is valid on its face, but instead assess the challenge by testing it in the circumstances of the individual case and considering whether the statutory language was sufficiently clear to give the defendant adequate notice that his conduct was proscribed."  *State v. Reckards*, 2015 ME 31, ¶ 4, 113 A.3d 589 (quotation marks omitted).  "[N]ot every ambiguity, uncertainty or imprecision of language in a statutory pattern is unconstitutional, and a statute will withstand a vagueness challenge if any reasonable construction will support it."  *Beauchene v. State*, 2017 ME 153, ¶ 15, 167 A.3d 569 (quotation marks omitted).  That certain terms are undefined in a statute "does not render the statute unconstitutional," and "broad terms enable the trial court, in its role as factfinder, to weigh the evidence and to [make] determin[ations]."  *Id.*

[¶23]    The two standards in the statute that J. argues are unconstitutionally vague are "likelihood of foreseeable harm" and "in the foreseeable future."  "Likelihood of foreseeable harm" is defined in section 3862-A, and the definition includes specific circumstances that must be shown:

14

"Likelihood of foreseeable harm" means a substantial risk in the foreseeable future of serious physical harm to the person as manifested by recent behaviors or threats of, or attempts at, suicide or serious self-inflicted harm; or a substantial risk in the foreseeable future of serious physical harm to other persons as manifested by recent homicidal or violent behavior or by recent conduct or statements placing others in reasonable fear of serious physical harm.

34-B M.R.S. § 3862-A(1)(G).

[¶24]  Other sections of Title 34-B use similar terminology.  *See, e.g.*, 34-B M.R.S. § 3801(4-A) (2022) (definitions section of the hospitalization subchapter for Maine's behavioral and developmental services statute); 34-B M.R.S. § 3873-A(1)(B) (2022) (progressive treatment program statute); 34-B M.R.S. §§ 3862, 3863, 3864(4)(E)(3) (2022) (protective custody, emergency admissions to a psychiatric hospital, judicial procedure and commitment statutes).  Similar terminology is also found in other statutes.  *See, e.g.*, 34-A M.R.S. § 3049(1)(B) (2022) (involuntary medication of a person with mental illness); 34-A M.R.S. § 3069-B (2022) (placement of defendants for observation); 34-A M.R.S. § 3069-C (2022) (placement of defendants found incompetent to stand trial); 15 M.R.S. § 104-A (2022) (statute governing release and discharge from psychiatric hospitalization).

[¶25]  We have rejected void-for-vagueness constitutional challenges made against similar language used in 15 M.R.S. § 104-A(1), which requires the

trial court to consider whether the "person may be released or discharged without likelihood that the person will cause injury to that person or to others due to mental disease or mental defect." We emphasized that the broad terms in the statute provide sufficient notice and allow the trial court to make case-by-case determinations. *Beauchene*, 2017 ME 153, ¶ 15, 167 A.3d 569; *see also Gessner v. State*, 2017 ME 139, ¶¶ 8-9, 166 A.3d 980.

[¶26] Not only has the term "likelihood" been widely used throughout Maine statutes without constitutional issue, but we have also provided a definition. In the context of "likelihood of success on the merits," we defined "likelihood" as "at most, a probability; at least, a substantial possibility." *Bangor Hist. Track, Inc. v. Dep't of Agric.*, 2003 ME 140, ¶ 9, 837 A.2d 129.

[¶27] Given the clear definition provided within the statute, the wide usage of similar language in other statutes, the constitutionality of that language in those statutes, and our case law, the court did not commit obvious error when it applied the statute and did not determine it was void for vagueness.

## C. Sufficiency of the Evidence

[¶28] Section 3862-A(6)(D)(2) requires that a court find "that there is clear and convincing evidence to continue or extend the initial restrictions."

"When the burden of proof at trial is clear and convincing evidence, our review is to determine whether the fact-finder could reasonably have been persuaded that the required findings were proved to be highly probable." *In re Children of Shem A.*, 2020 ME 65, ¶ 7, 232 A.3d 236 (quotation marks omitted). "We review the court's findings for clear error and will affirm the decision unless there is no competent evidence in the record to support it." *In re Steven L.*, 2017 ME 5, ¶ 11, 153 A.3d 764.

[¶29] Title 34-B M.R.S. § 3862-A(6)(C) requires the court to

consider all relevant evidence, including, but not limited to, recent threats or acts of violence by the restricted person directed toward other persons; recent threats or acts of violence by the restricted person directed toward the restricted person; recent acts of unlawful abuse of animals by the restricted person; the reckless use or threatening display of a dangerous weapon by the restricted person; a history of the use, attempted use or threatened use of physical force by the restricted person against other persons; a record of prior custodial events or restrictions under this section; prior involuntary confinement of the restricted person in a hospital for persons with psychiatric disabilities; prior protection from abuse and protection from harassment orders against the restricted person or violations regarding protection from abuse or protection from harassment by the restricted person; evidence of stalking behavior, severe obsession or sexual violence by the restricted person; the illegal use of controlled substances by the restricted person; and evidence of alcohol or drug abuse by the restricted person. The court shall also consider whether the restricted person is receiving treatment responsive to that person's mental health or substance use needs.

[¶30]  Here, the court was presented with evidence of several of these factors demonstrating a "likelihood of foreseeable harm."  During the hearing, the court heard the portions of the 9-1-1 call where J. threatened to kill police officers numerous times.  The court heard testimony from J. and one of the responding deputies that it took multiple shots with less-than-lethal rounds to disarm J.  The court also heard testimony from both the deputy and the treating physician that J. remained agitated after being taken into protective custody.

[¶31]  Although some of the circumstances that led to the incident may have been alleviated, the court also heard evidence that J. had not taken steps to address other issues that may have led to the incident.  He had not undergone counseling, he had continued to drink, his brother was still living with his mother and purportedly taking advantage of her, and, when asked about the lessons he had learned from the incident, J. responded, "Never call 9-1-1."  Competent evidence supported the court's decision to extend the restrictions.

## D.  Factual Findings

[¶32]  Although the court found that there was "clear and convincing evidence to continue or extend the initial weapons restriction[s]," it did not make any further factual findings in its order and left blank the space on the order intended for those findings.  Section 3862-A(6)(D) governs court orders

made under the statute and requires only that "the court find[] after hearing that there is clear and convincing evidence to continue or extend the initial restrictions." In its order, the court made the requisite finding, thereby meeting the statutory requirements. Because J. did not file a motion for findings of fact and "include the proposed findings of fact and conclusions of law requested," M.R. Civ. P. 52(a), we "must assume that the court found those facts necessary to support its conclusion . . . from the evidence presented." *Markley v. Semle*, 1998 ME 145, ¶ 6, 713 A.2d 945; *see also Sullivan v. Doe*, 2014 ME 109, ¶ 19, 100 A.3d 171.

[¶33] Here, as discussed above, the trial court was presented with sufficient evidence to find that J. presented a "likelihood of foreseeable harm." 38 M.R.S. § 3862-A. Therefore, we do not vacate the trial court's order extending the initial weapons restriction until September 22, 2022.

## E. Prosecutorial Misconduct

[¶34] J. argues that the prosecutor made an improper closing argument that (1) shifted the burden of proof to the defendant and (2) appealed to emotion and fear. The portion of the State's closing argument at issue is as follows:

> And I challenge the Court to ask itself this question: two months from now, six months from now, if we were to find out that [J.] shot

and killed himself, his girlfriend, or a police officer, would we in good conscience be able to look back to today and say yeah, there was no likelihood that that would happen based on what happened two weeks ago. We would not. I sincerely hope and would like to believe that that is not going to happen, but as we sit here today, we cannot honestly say that there is no likelihood of that happening, of that foreseeable harm based on what happened less than two weeks ago, and that the State has proven by clear and convincing [evidence].

[¶35] "We review instances of alleged prosecutorial misconduct to first determine whether the misconduct occurred." *State v. Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473. If misconduct—in this case an alleged improper closing argument—occurred, then we review "the State's comments as a whole, examining the incidents of misconduct both alone and taken together." *Id.* As an initial matter, during the trial, J. did not object to the portion of the prosecutor's closing argument that he now argues was improper. The argument is unpreserved, and, therefore, we review "for obvious error affecting substantial rights." *Caruso v. Jackson Lab'y*, 2014 ME 101, ¶ 21, 98 A.3d 221 (quotation marks omitted).

[¶36] "[P]rosecutor[s] must limit [their] argument[s] to the facts in evidence." *State v. Hinds*, 485 A.2d 231, 237 (Me. 1984). Although this is a civil matter, we have stated that "[s]hifting the burden of proof to the defendant or suggesting that the defendant must present evidence in a criminal trial is

improper closing argument." *Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473. Similarly, a prosecutor's inflammatory or emotionally charged remarks are improper. *State v. Stanton*, 1998 ME 85, ¶ 12, 710 A.2d 240.

[¶37] There was no improper shifting of the burden here. Although the prosecutor may have been imprecise in stating the argument, the State acknowledged it had the burden to prove the "likelihood of foreseeable harm" by "clear and convincing" evidence. Nothing in the court's findings suggests that, because of the State's argument, it misunderstood the burden of proof. J. cannot, therefore, establish obvious error. *See State v. Ferguson*, 2019 ME 10, ¶ 25, 200 A.3d 272 (stating that the potential for prejudice is lessened in a bench trial).

[¶38] We also reject the argument that these remarks were emotionally charged. The statements made by the prosecutor were firmly based in evidence. The court heard, through both testimony and the 9-1-1 call entered in evidence, that J. had threatened to kill himself, the police, and his girlfriend. These issues were directly related to the decision that the court had to make under the statute. *See* 34-B M.R.S. § 3862-A(6)(C).

The entry is:

Judgment affirmed.

Lawrence C. Winger, Esq. (orally), Portland, for appellant J.

Jonathan Sahrbeck, District Attorney, and Carlos Diaz, Asst. Dist. Atty. (orally), Cumberland County District Attorney's Office, Portland, for appellee State of Maine

Portland District Court docket number MH-2021-240
FOR CLERK REFERENCE ONLY