MAINE SUPREME JUDICIAL COURT    Reporter of Decisions
Decision:  2023 ME 26
Docket:   And-22-105
Argued:   February 7, 2023
Decided:  April 18, 2023

Panel:   MEAD, JABAR, HORTON,* and CONNORS, JJ., and CLIFFORD, A.R.J.

# STATE OF MAINE

v.

# DAVID P. HUNT JR.

MEAD, J.

[¶1]  David P. Hunt Jr. appeals from a judgment of conviction of two counts of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2023), and two counts of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1) (2023), entered by the trial court (Androscoggin County, *Stewart, J.*) following a jury trial.  Hunt contends that the court should have granted his request to continue the trial to allow him more time to obtain the victim's out-of-state counseling records and should not have required participants in the trial to wear masks.  He also contends that statements made during the State's opening statement and closing and rebuttal arguments constituted prosecutorial error

---

 * Although not available at oral argument, Justice Horton participated in the development of this opinion.  *See* M.R. App. P. 12(a)(2) ("A qualified Justice may participate in a decision even though not present at oral argument.").

2

and that the court made several evidentiary errors during the trial.  We discern no error and affirm the judgment.

## I. BACKGROUND

[¶2]  Viewing the evidence admitted at trial in the light most favorable to the State, the jury rationally could have found the following facts.  *See State v. Beeler*, 2022 ME 47, ¶ 2, 281 A.3d 637.

[¶3]  The victim's mother married Hunt in 2007, the year the victim turned seven.  At that time the family lived in Massachusetts, but shortly thereafter moved to Georgia.  In Georgia, when the victim was seven, after telling the victim's mother to leave the house with the victim's younger stepsister, Hunt sexually assaulted the victim.  When he was done, Hunt told the victim not to tell anyone or he would hurt her mother; she obeyed.  The victim was scared of Hunt because he had a gun that he had shown her and let her hold.  After the first incident, Hunt sexually assaulted the victim repeatedly; she did not know how often.  After the family returned to Massachusetts, when the victim was age seven or eight, Hunt continued to sexually assault her repeatedly.

[¶4]  When the victim was age eight or nine and in the fourth grade, the family moved to Auburn, Maine.  They lived in Maine for over a year, from 2009

to 2010. When they lived in Auburn, Hunt continued to sexually assault the victim, sometimes more than four times in a week, while her mother worked or shopped. The victim did not tell anyone of the sexual assaults, which numbered close to 200 in total during the time she lived in Maine.

[¶5] After living in Auburn, the family moved back to Massachusetts. Hunt's sexual assaults on the victim continued until the Christmas season of 2011, when she was age eleven. At some point Hunt and the victim's mother separated and he moved out. After that, at a sleepover with some close friends, the victim disclosed what Hunt had done to her. One of her friends told her mother what the victim had disclosed; the friend's mother then told the victim's mother.

[¶6] The victim's mother took her to the Yarmouth (Massachusetts) Police Department and the victim, still age eleven, was interviewed in February 2012. Massachusetts authorities then contacted the Auburn Police Department. Hunt was interviewed by an Auburn detective and denied ever touching the victim inappropriately.

[¶7] As a result of a clerical error, nothing happened with the case from 2012 until 2017, when the Auburn Police Department performed a records check on Hunt, discovered the error, and notified Massachusetts police. After

4

the error was discovered, a Yarmouth (Massachusetts) Police detective contacted the victim and her mother; they came to the police department where the detective explained what had happened. In talking to the victim, then age sixteen, it was "immediately obvious" to the detective that the victim "had a much better understanding of what had occurred to her at the hands of Mr. Hunt." The detective reinterviewed the victim in June 2017, after which the case was assigned to an Auburn Police detective concerning the assaults that had occurred in Maine.

[¶8] In April 2018, Hunt was indicted on two counts of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C); one count of unlawful sexual contact (Class A), 17-A M.R.S. § 255-A(1)(F-1) (2023); and one count of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1), all alleged to have occurred in 2009 in Auburn. After the victim testified at trial, the Class A charge of unlawful sexual contact was reduced to a Class B offense. 17-A M.R.S. § 255-A(1)(E-1). The case went to trial February 22-24, 2022, and the jury returned a verdict of guilty on each count.

[¶9] At the sentencing hearing on April 5, 2022, the court entered judgment and sentenced Hunt to thirty years' imprisonment on the gross sexual assault convictions and ten years on the unlawful sexual contact convictions, all

concurrent, along with lifetime supervised release.  Hunt timely appealed and filed an application for leave to appeal from the sentence.  The Sentence Review Panel denied Hunt leave to appeal from the sentence.

## II.  DISCUSSION

### A.    Motion to Continue

#### 1.    Pretrial Procedure

[¶10]  Beginning in September 2018, Hunt, represented by a member of his trial counsel's law firm, successfully moved several times to continue the case on the ground that it was necessary for him to review the victim's Massachusetts therapy and child protective services records that had been provided to a Massachusetts criminal court for its camera review.   In June 2019, Hunt moved in limine, pursuant to M.R.U. Crim. P. 17(c), (d), for permission to subpoena the Massachusetts records; the court (*Martin, J.*) granted the motion and entered an order invoking the procedure set out in M.R.U. Crim. P. 17(d), (e).

[¶11]  Eight months later, Hunt again moved to continue the trial on the ground that he still had not been able to review the records.  He represented that his Massachusetts criminal case was close to being set for a jury trial, after which he thought the records would be available.  The court (*Stanfill, J.*) granted

the motion in an order dated February 5, 2020, noting "final—to get records." The arrival of the pandemic then further delayed the case for an extended period.

### 2. Trial Procedure

[¶12]  On February 21, 2022, two years after the last continuance and the day before the trial was to begin, Hunt's trial counsel filed a "Motion to Enforce Subpoenas," requesting "that the [c]ourt order compliance with the subpoena and enlist the assistance of Massachusetts courts, if necessary." The motion stated that subpoenas seeking the victim's records had been served on the appropriate Massachusetts agencies on August 6 and 9, 2019, but no records had been produced.

[¶13]  Prior to jury selection, the court (*Stewart, J.*) conferred with the parties to "make our record regarding the motion[]." Hunt's trial counsel told the court that prior to filing the motion he "was not aware that [Hunt's prior counsel] had filed and obtained subpoenas," but recently another of Hunt's former attorneys, also a former member of trial counsel's law firm, "told me he had a conversation with the Massachusetts attorney who said he had obtained or seen the records but that the Massachusetts court prohibited him from sharing them with . . . our firm." Trial counsel said that he "file[d] [the] motion

[to enforce subpoenas] to protect the record." That said, he told the court, "I'm fully prepared to go forward, Your Honor."

[¶14] The State confirmed that it did not have any therapy records concerning the victim and was not going to introduce any evidence concerning her therapy. The State further represented that the lead detective in Massachusetts had told the prosecutor that "essentially . . . there [were] no records. There was . . . [no] real substance in the notes."

[¶15] Noting the state of the record and the State's objection to a late continuance, the court declined to continue the case

> given . . . that this is an issue that was teed up as long ago as it was, [and] the [c]ourt did what it needed to do. Sounds like there might have been a number of impediments, [and] without laying fault on anyone at this stage of the game, [given] the age of the case [and] the time that's passed. The motion to continue is denied.

**3.   Analysis**

[¶16] Hunt contends that the denial of a continuance to further pursue enforcement of the Massachusetts subpoenas violated his right to due process[1] and was an abuse of the court's discretion. "We review a court's denial of a motion to continue for an abuse of discretion examining whether the denial had

---

[1] In making this argument, as with his Confrontation Clause claim discussed *infra*, Hunt relies on the federal constitution, not the relevant sections of the Maine Constitution. *See* U.S. Const. amends. VI, XIV, § 1; Me. Const. art. I, §§ 6, 6-A.

8

any adverse prejudicial effect on the movant's substantial rights and viewing each case largely upon its own facts and circumstances." *State v. Gaston*, 2021 ME 25, ¶ 28, 250 A.3d 137 (quotation marks omitted). "When due process is implicated, we review such procedural rulings to determine whether the process struck a balance between competing concerns that was fundamentally fair." *Adoption by Jessica M.*, 2020 ME 118, ¶ 8, 239 A.3d 633 (quotation marks omitted). "Although the trial court's discretion must be exercised judiciously and with an eye toward fundamental fairness, even the arbitrary denial of a continuance cannot sink to the level of a due process violation unless it results in actual prejudice." *State v. Dube*, 2014 ME 43, ¶ 13, 87 A.3d 1219 (quotation marks omitted).

[¶17] Within this legal framework, we begin by "look[ing] first at the reasons contemporaneously presented in support of the request for the continuance because the party seeking a continuance has the burden of establishing a substantial reason why granting the continuance would further justice." *KeyBank Nat'l Ass'n v. Est. of Quint*, 2017 ME 237, ¶ 20, 176 A.3d 717 (quotation marks omitted). We conclude that here, given the age of the case; the number of continuances that had been granted over a span of several years without any affirmative action by Hunt to enforce in Massachusetts courts the

subpoenas that the Maine court had authorized; the timing of Hunt's most recent request for a continuance on the day before the trial; the question raised by the Massachusetts lead detective as to whether the records would have any strategic value; and trial counsel's representation that he was "fully prepared to go forward," the court did not abuse its discretion in denying a continuance. *See Gaston*, 2021 ME 25, ¶ 28, 250 A.3d 137.

### B.    Masking Requirement

[¶18]  Hunt invokes the Sixth Amendment in contending that his right to confrontation was violated by the court's requirement that he and the victim wear masks during the trial.  He asserts that the jury was "denied the opportunity to see [the victim's] face during the questioning and [Hunt's face] to 'humanize' him," and that jurors had difficulty hearing the victim's testimony. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "We review the application of the Confrontation Clause de novo," *State v. Lovell*, 2022 ME 49, ¶ 13, 281 A.3d 651 (quotation marks omitted), although "[w]e look to federal jurisprudence in interpreting the United States' and Maine's confrontation clauses," *State v. Johnson*, 2014 ME 83, ¶ 8 n.2, 95 A.3d 621.

10

[¶19]  At the start of jury selection, the court directed that Hunt and the attorneys would briefly lower their masks when they were introduced to the jury pool.  When the initial group of jurors was randomly selected from the pool, each prospective juror then lowered his or her mask.

[¶20]  After the jury was empaneled but before it was sworn, the prosecutor asked if the attorneys could remove their masks when giving their opening statements.  The court answered, "I continue to ask the [Superior Court Chief Justice], and I continue to be told no word yet so we are still masking." Hunt then "put an objection on the record . . . as far as the nature of this case and what I perceive to be unfair not being able to unmask, especially for witnesses . . . . I continue to have concerns about witnesses' credibility being determined and people hearing correctly . . . ."[2]  Although the court "share[d] in everyone's position," it did not change its ruling.

[¶21]  At the beginning of the second day of the trial, the court advised the parties that "some of the jurors have spoken to the jury marshal [and said] that they're not hearing everything or there were a few times yesterday they didn't hear everything, so . . . be sure to stay close to your mics, and I will tell

---

  [2]  Contrary to the State's argument, Hunt's objection was sufficient to preserve this issue for appeal.

them to speak freely if they're having difficulty."  The court agreed with Hunt's suggestion to have jurors raise their hands if they could not hear; Hunt did not ask for any other action or move for a mistrial on that ground.  The court then instructed the jury that "anytime you can't hear, just let us know, raise your hand or something . . . It's important you are able to see and hear everything that's going on."

[¶22]  Shortly after the victim began her testimony, a juror indicated to the court that the juror could not hear the witness.  The court asked the victim to speak up and offered the juror—and all of the jurors—a hearing assistance device, which the juror and one other juror accepted.  The juror who initially had a problem indicated that the hearing issue was resolved.  At sidebar, Hunt renewed his objection:

> [T]his is the exact reason why I'm concerned about having trials with masks.  I just wanted to reiterate on the record given my objection yesterday.

The court indicated that the mask requirement remained in effect.  The trial then resumed without further expressions of hearing difficulty by jurors.

[¶23]  Although we have not addressed the issue, Hunt correctly notes that numerous other courts have held that requiring masks in light of the pandemic does not violate the Confrontation Clause; he cites no decision

12

holding the contrary. Representative of the prevailing view is *Lopez v. Gamboa*, where the United States District Court for the Central District of California, in a well-reasoned opinion citing numerous other federal decisions, recently upheld a masking requirement on facts very similar to those presented here. No. CV 22-4281-JEM, 2022 U.S. Dist. LEXIS 226427 (C.D. Cal. Dec. 15, 2022). The *Lopez* Court explained:

> Petitioner contends that the trial court denied him the right to confront witnesses, the right to effective cross-examination, and the right to a reliable jury determination of the charges when it required him and the testifying witnesses to wear masks that prevented the jury and counsel from observing facial expressions below the eyes. . . .

> At the time of Petitioner's trial . . . [the courts] were operating under safety protocols adopted in response to the Covid-19 pandemic. The applicable administrative order mandated, among other things, that all persons entering any courthouse wear a face mask covering the mouth and nose.[3]

> . . . Nevertheless, the trial court allowed Petitioner, trial counsel, and the prosecutor to briefly remove their masks when introduced to the jury . . . .

> . . . .

> . . . "[T]he Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of

---

[3] *See* PPMO-SJC-1(A)-(B) State of Maine Judicial Branch Post-Pandemic Management Order at 2 (revised Aug. 16, 2021) (requiring that "[e]very litigant, lawyer, juror . . . or other member of the public who enters a Maine courthouse . . . wear a . . . mask . . . that covers the person's nose and mouth," and that "[a]ll persons . . . adhere to face covering requirements while in courtrooms unless and until the presiding judicial officer specifically permits any individuals to remove their face coverings");

fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988). But the Confrontation Clause does not guarantee criminal defendants "the *absolute* right to a face-to-face meeting with witnesses against them at trial." *Maryland v. Craig*, 497 U.S. 836, 844 (1990) (emphasis in original). Face-to-face confrontation at trial is preferred, but it is not an indispensable element of the Sixth Amendment right to confront one's accusers. *Id.* at 849-50. Exceptions to "a physical, face-to-face confrontation at trial" are constitutionally permissible when "necessary to further an important public policy," as long as "the reliability of the testimony is otherwise assured." *Id.* at 850.

. . . .

Applying *Craig*, numerous federal district courts around the country have concluded that no Confrontation Clause violation occurs when witnesses are required to wear masks covering their mouth and nose to minimize the risk of transmission of the Covid-19 virus. . . .[4]

. . . .

. . . The Supreme Court has never held that a criminal defendant's Sixth Amendment right to confront witnesses is violated when witness[es] are partially masked while testifying. On the contrary, the Supreme Court has held that exceptions to a defendant's right to confront witnesses face to face are constitutionally permissible when "necessary to further an

---

PPMO-SJC-1 State of Maine Judicial Branch Post-Pandemic Management Order at 2 (revised Mar. 11, 2022) (rescinding PPMO-SJC-1(A)-(B) effective March 14, 2022). Hunt's trial took place on February 22-24, 2022, when the masking requirement was still in place.

4 Collecting cases, the court cited *United States v. Maynard*, No. 2:21-cr-00065, 2021 U.S. Dist. LEXIS 211943, at *2-6 (S.D. W. Va. Nov. 3, 2021); *United States v. Holder*, No. 18-cr-00381-CMA-GPG-01, 2021 U.S. Dist. LEXIS 184017, at *23-24 (D. Colo. Sept. 27, 2021); *United States v. Clemons*, No. RDB-19-0438, 2020 U.S. Dist. LEXIS 206221, at *5-8 (D. Md. Nov. 4, 2020); *United States v. James*, No. CR-19-08019-001-PCT-DLR, 2020 U.S. Dist. LEXIS 190783, at *4-6 (D. Ariz. Oct. 15, 2020); and *United States v. Crittenden*, No. 4:20-CR-7 (CDL), 2020 U.S. Dist. LEXIS 151950, at *13-22 (M.D. Ga. Aug. 21, 2020).

important public policy," as long as "the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850.

. . . Petitioner does not dispute that minimizing the risks of transmission of Covid-19 in the courtroom is an important public policy. . . . *Craig* requires only that the reliability of [a witness's] testimony must be assured under the alternative means of confrontation.

The Supreme Court has explained that "[t]he combined effect of [the] elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable" and subject to "rigorous adversarial testing." *Id.* at 846. There was no impairment of the first three elements of confrontation at Petitioner's trial. The witnesses were physically present in front of the jury and Petitioner; they were under oath; and they were subject to cross-examination. Only the fourth element, observation of the witnesses' demeanor, was slightly impaired because a mask covering the lower part of a witness's face prevented the jurors from seeing the facial expression as conveyed by the mouth and nose. The Confrontation Clause does not require that the jury be able to see a witness's entire face or body. The jurors were still able to see the witnesses' eyes, observe their body language, and hear their tone of voice. Because the covering of the nose and mouth does not significantly hinder observation of demeanor, allowing witnesses to testify while wearing masks does not materially diminish the reliability of the witnesses' testimony.

Petitioner also argues that his right to confrontation was violated because his own mask prevented the jurors and the testifying witnesses from seeing his expression in response to the witnesses' testimony. The Supreme Court has never held that a defendant's Sixth Amendment right to confront the witnesses against him encompasses a right to convey to the jury his reaction to their testimony through his facial expressions. The witnesses testified in Petitioner's physical presence and were able to see his

full person, which would impress upon them the gravity of the proceedings at which they testified. In any event, as discussed above, the mask covering Petitioner's nose and mouth did not significantly hinder observation of his demeanor.

*Id.* at *8-12, *14-17 (alteration, citations, footnote, and quotation marks omitted).

[¶24] What was true in *Lopez* is true in this case as well. During Hunt's trial, "[t]he witnesses were physically present in front of the jury and [Hunt]; they were under oath; and they were subject to cross-examination." *Id.* at *15 (footnote omitted). Although the witnesses wore masks covering their nose and mouth, "[t]he jurors were still able to see the witnesses' eyes, observe their body language, and hear their tone of voice." *Id.*; *see United States v. Crittenden*, No. 4:20-CR-7 (CDL), 2020 U.S. Dist. LEXIS 151950, at *20 (M.D. Ga. Aug. 21, 2020) ("[B]eing able to see a witness's nose and mouth is not essential to testing the reliability of the testimony. Demeanor consists of more than those two body parts. Demeanor includes the language of the entire body. Here, the jurors will be able to observe most facets of the witnesses' demeanor. They can observe the witnesses from head to toe. They will be able to see how the witnesses move when they answer a question; how the witnesses hesitate;

how fast the witnesses speak. They will be able to see the witnesses blink or roll their eyes, make furtive glances, and tilt their heads.").

[¶25] We find persuasive and adopt the reasoning of *Lopez* and other courts and discern no constitutional error in the trial court's ruling requiring that participants in Hunt's trial be masked, given that the court "was faced with a global pandemic and restrictions on courtroom access . . . applicable to all Maine state courts." *Gaston*, 2021 ME 25, ¶ 31, 250 A.3d 137.

## C. Prosecutorial Error

[¶26] Hunt contends that at various points in its opening statement and closing and rebuttal arguments, the State committed prosecutorial error by improperly urging the jury to find him guilty, by suggesting that he had a burden to demonstrate a motive for the victim to lie, and by vouching for the victim's credibility.

[¶27] We begin our analysis by

> review[ing] instances of alleged prosecutorial misconduct to first determine whether the misconduct occurred. If misconduct . . . occurred, then we review the State's comments as a whole, examining the incidents of misconduct both alone and taken together. . . .
>
> Prosecutors must limit their arguments to the facts in evidence. . . . Shifting the burden of proof to the defendant or suggesting that the defendant must present evidence in a criminal

trial is improper closing argument. Similarly, a prosecutor's inflammatory or emotionally charged remarks are improper.

*In re Weapons Restriction of J.*, 2022 ME 34, ¶¶ 35-36, 276 A.3d 510 (alterations and quotation marks omitted). Likewise, "prosecutors cannot vouch for their witnesses," *State v. Westgate*, 2020 ME 74, ¶ 22, 234 A.3d 230, by "injecting personal opinion regarding the credibility of a witness or . . . by using the authority or prestige of the prosecutor's office" to bolster a witness's credibility, *State v. Robbins*, 2019 ME 138, ¶ 10, 215 A.3d 788 (alterations and quotation marks omitted).

### 1. Opening Statement

[¶28] Hunt did not object to the State's opening statement at trial; accordingly we review "for obvious error affecting substantial rights." *In re Weapons Restriction of J.*, 2022 ME 34, ¶ 35, 276 A.3d 510 (quotation marks omitted).

[¶29] During the State's opening, the prosecutor told jurors that they had

the ability to listen to somebody and to judge credibility, to take in information and to decide what it is and who it is that you believe. Throughout the course of this trial you're going to meet [the victim], and when we are finished with the evidence in this case, I will be asking that you believe her.

[¶30] At the conclusion of the opening statement, Hunt requested a sidebar and expressed "a concern" that the prosecutor's comment "suggested

18

that we have some burden." The court said, "I heard the entire opening [and] I didn't think that there was a shifting of the burden," but nonetheless, at Hunt's request, the court instructed the jury that "the burden of proof in this case is entirely with the State" and that Hunt "does not have to prove anything in this matter." Hunt said he was satisfied with the instruction and proceeded to give an opening statement. A jury is presumed to follow the court's instructions. *State v. Carrillo*, 2021 ME 18, ¶ 25, 248 A.3d 193.

[¶31] Here, the court's decision not to declare a mistrial sua sponte following the State's opening, during which the prosecutor said only that the evidence would allow the jury to believe the victim, was not error, much less obvious error.

**2. Closing Argument**

[¶32] Hunt asserts that at several points during the State's closing argument, the prosecutor improperly "urged the jury . . . to find [him] guilty, as opposed to simply suggesting the evidence prove[d] his guilt beyond a reasonable doubt" and "strongly suggested to the jury that [he] had not proven a motive for [the victim] to make this up or put herself through this." He did not object during or at the conclusion of the State's closing, and so once again our review is for obvious error. *In re Weapons Restriction of J.*, 2022 ME 34,

¶ 35, 276 A.3d 510; *see Robbins*, 2019 ME 138, ¶ 11, 215 A.3d 788 ("An error affects a criminal defendant's substantial rights if the error was sufficiently prejudicial to have affected the outcome of the proceeding. . . . When a prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding." (alteration, citation, and quotation marks omitted)).

[¶33]  The record reveals no obvious error because the prosecutor's argument remained focused on the evidence and the jury's role in determining the facts from that evidence:

- "Soon . . . you will begin your job . . . as judges of the facts."

- "[The victim's] testimony standing alone, if you believe her, is all of the evidence that you would need to find beyond a reasonable doubt that the defendant is guilty. . . . Now, I'd like to talk to you about why it is that you should believe her."

- "[T]he testimony that you heard in this trial supports each and every element of these charges . . . ."

- "Find him guilty because the evidence supports that he is guilty of every one of these charges beyond a reasonable doubt."

[¶34]  Excerpts of the closing argument cited in Hunt's brief were preceded and followed by citations to the evidence and how that evidence

supported the State's view of the case. *See In re Weapons Restriction of J.*, 2022 ME 34, ¶ 38, 276 A.3d 510 ("We also reject the argument that [the prosecutor's] remarks were emotionally charged. The statements made by the prosecutor were firmly based in evidence.").

### 3. Rebuttal Argument

[¶35] Hunt did not object during or immediately following the State's rebuttal argument. After the court gave the jury its final instructions but before the jury retired to begin deliberating, Hunt moved for a mistrial "based on the rebuttal," asserting that the State had improperly urged the jury to find him guilty and suggested that he had "some burden." Alternatively, Hunt asked the court to repeat its instruction that he had no burden of proof. The court denied a mistrial, but reinstructed the jury "one last time that in this case the defense does not have any burden. The burden of proof is entirely with the State, and it is the State's burden to [prove] guilt beyond a reasonable doubt." When given the opportunity to object or comment on the reinstruction, Hunt said that he had nothing further to add.

[¶36] Hunt now argues that the court erred in denying his delayed motion for a mistrial and instead giving an additional instruction on the State's burden of proof. In presenting the State's rebuttal argument, the prosecutor

was, as the court noted, "very passionate," but we have noted that "[a] prosecutor may present an analysis of the evidence in summation with vigor and zeal . . . . We have repeatedly upheld the prosecutor's ability to argue vigorously for any position, conclusion, or inference supported by the evidence." *State v. Scott*, 2019 ME 105, ¶ 26, 211 A.3d 205 (alterations and quotation marks omitted). Furthermore, "a prosecutor is free to comment on the consistency of a witness's testimony—just as the defense is free to comment on the inconsistency of a witness's testimony." *Westgate*, 2020 ME 74, ¶ 22, 234 A.3d 230.

[¶37] The record supports the court's determination that the prosecutor had not "crossed any of the lines," because the State's argument remained focused on findings and inferences that the jury could make based on what the prosecutor characterized as the "overwhelming evidence" and the jury's collective "common sense," not on the prosecutor's personal opinion of any witness's credibility. The prosecutor ended the State's rebuttal argument by again referring to the critical evidence in the case and the jury's role in assessing it: "If you believe [the victim], if you believe that young woman and believe what she told you . . . then the State has met its burden. You have all of the evidence that you need to find him guilty." Only then did the prosecutor

close by urging the jury to "[f]ind him guilty." At that point, the jury had already been instructed that closing arguments are not evidence and that it could believe all, some, or none of what any particular witness said, in addition to receiving repeated instructions concerning the State's burden of proof.

[¶38] Because we conclude that no prosecutorial error occurred, and because Hunt's concerns were amply addressed through the court's instructions to the jury, the court did not abuse its "substantial discretion" in denying Hunt's motion for a mistrial. *Carrillo*, 2021 ME 18, ¶ 19, 248 A.3d 193.

### D. Evidentiary Rulings

[¶39] Hunt asserts that the court made several evidentiary errors requiring that we vacate the judgment, contending that the court abused its discretion in denying his delayed motion for a mistrial after a detective who interviewed the victim testified that a trauma victim's memory is often fragmented, and in allowing the victim's former school nurse to testify that the victim's somatic symptoms "made sense" to her once she learned of the victim's disclosure of Hunt's sexual abuse. Hunt further contends that the court clearly erred or abused its discretion in admitting evidence of his sexual assaults on the victim occurring outside of Maine, and in limiting his ability to use his

communications with the victim's mother occurring after the assaults ended. We address these arguments in turn.

### 1. Detective's Testimony

[¶40]  The Massachusetts detective who interviewed the victim in 2017 testified that he was assigned to a special victim's unit tasked with investigating crimes against children, that he had received specialized training in that area, and that he had been involved in some 200 such investigations and interviewed "[m]any, many" victims of sexual assault.

[¶41]  On direct examination, when asked whether it was "common, based on your experience, for a victim's memory of traumatic events to be fragmented," the detective answered, "Almost all the time, absolutely, yes." Hunt did not object. When the State then asked about a victim's bodily response to trauma, the court sustained Hunt's objection that the question called for expert testimony and directed the State to rephrase.  The prosecutor then essentially repeated the last allowed question, namely "whether in your experience it's common for a victim's memory of traumatic events to be fragmented"; the detective answered, "Very often, yes."  Again Hunt did not object.

24

[¶42]  Later, the prosecutor asked whether the detective could "explain, without getting into the science of it, what [it] can look like in terms of traumatic events causing fragmented memory."  When Hunt expressed concern that the answer might be objectionable, the court directed the State to ask another question and sustained Hunt's eventual objection.  The State ended its direct examination and Hunt proceeded to cross-examine the detective; he did not move for a mistrial.

[¶43]  The following day, Hunt moved for a mistrial:

> I don't exactly remember the nature of the testimony.  The record will reflect.  There was maybe one or two objections to some of [the detective's] testimony regarding memory and memory recall and other things that I objected to as expert opinion.  At the time I did not ask for a mistrial, but I would make that motion now.  I know the court did sustain the objections at the time.

The court, noting that it had indeed sustained Hunt's objections when "it sounded like . . . we were getting into expert testimony type material," denied the motion, ruling that "there's not a basis for mistrial."

[¶44]  Hunt now contends that he was entitled to a mistrial because the court erroneously admitted expert testimony and because "the questioning by the prosecutor regarding [the detective's] opinions directly after the [c]ourt sustained [his] objection . . . constitutes prosecutorial bad faith."

[¶45]  "We review the denial of a motion for a mistrial for an abuse of discretion and will overrule the denial of a mistrial only in the event of exceptionally prejudicial circumstances or prosecutorial bad faith.  A motion for a mistrial should be denied except in the rare circumstance that the trial is unable to continue with a fair result and only a new trial will satisfy the interests of justice." *State v. Williams*, 2020 ME 128, ¶ 34, 241 A.3d 835 (citation and quotation marks omitted); *see Carrillo*, 2021 ME 18, ¶ 19, 248 A.3d 193 ("Our review of a trial court's denial of a motion for a mistrial is highly deferential. . . . We review the court's denial of a motion for mistrial only for an abuse of the court's substantial discretion." (citations omitted)).

[¶46]  We conclude that the court's denial of Hunt's motion for a mistrial based on the detective's testimony was not an abuse of its discretion because the record reveals neither exceptionally prejudicial circumstances nor prosecutorial bad faith.  The detective did not testify as an expert; rather, he said that in his experience—gained from many child sexual assault investigations and interviews—a victim's memory of traumatic events was "[v]ery often" fragmented.  Put another way, the detective did not offer an opinion—expert or otherwise—as to why memory of a trauma is often fragmented; he testified only that he had observed that to be the case.  His

answer was "[r]ationally based on [his] perception" of child victims with whom he had personal experience and was therefore admissible as lay testimony. M.R. Evid. 701(a); *see State v. Thorne*, 490 A.2d 646, 648 (Me. 1985) ("Under Rule 701 . . . the determination of whether the opinion evidence is rationally based upon the perception of the lay witness and is helpful to the determination of the fact at issue is within the discretion of the trial justice." (alteration and quotation marks omitted)).

### 2. School Nurse's Testimony

[¶47] The victim's former Massachusetts school nurse testified that the victim had come to her with "somatic pain or somatic symptoms," which the nurse described as complaints that are "basically real to the person but not necessarily substantiated by a medical diagnosis." Later, in March 2012, the school principal informed her that the victim had made a disclosure of sexual abuse and Child Protective Services had been contacted. The nurse testified that once she learned of the victim's disclosure, her complaints "made sense now." Hunt did not object or move for a mistrial.

[¶48] Before the nurse testified, Hunt argued that, although he did not "have a problem talking about the somatic [complaints]," the State should have designated the nurse as an expert before she could testify that the complaints

"made sense" following the victim's disclosure. The court ruled that the "question of did [the victim's history of complaints] then make sense that there was this time in between the complaints and this disclosure" would be allowed.

[¶49] Hunt argues that the court's ruling was an abuse of its discretion. *See State v. Thomas*, 2022 ME 27, ¶ 23, 274 A.3d 356 ("We review a trial court's ruling on admissibility of evidence for abuse of discretion. A court abuses its discretion in ruling on evidentiary issues if the ruling arises from a failure to apply principles of law applicable to the situation, resulting in prejudice." (alteration, citation, and quotation marks omitted)). His argument fails because the nurse did not offer expert testimony; rather, she testified that as a factual matter, consistent with a report disclosed to the defense, the victim had complained of "a lot of abdominal pain, headaches, [and had displayed] emotional instability," and that those symptoms simply "made sense" to her after she learned of the victim's disclosure.

### 3. Out-of-State Conduct

[¶50] Hunt contends that the court erred in admitting evidence of his sexual assaults on the victim that occurred in other states. "We review evidentiary rulings for clear error and an abuse of discretion." *State v. Hinkel*, 2017 ME 76, ¶ 7, 159 A.3d 854.

28

[¶51]  The victim testified to many sexual assaults that Hunt committed against her in Georgia and Massachusetts.  We have held that although Maine Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character,"

> In cases involving sexual offenses, evidence of prior similar uncharged conduct has been admitted to show the relationship between the parties that in turn sheds light on the defendant's motive (i.e., attraction to the victim), intent (i.e., absence of mistake), and opportunity (i.e., domination of the victim) to commit the crime with which he was charged.  The probative value of the evidence must not be substantially outweighed by any prejudicial effect pursuant to [M.R. Evid.] 403.

*State v. Krieger*, 2002 ME 139, ¶ 8, 803 A.2d 1026 (citation and quotation marks omitted) (discussing a prior version of Rule 404(b)).

[¶52]  Hunt contends that the court's limiting instructions concerning this issue were insufficient to overcome "the significant and unfairly prejudicial effect of this evidence on the jury."  *See* M.R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . .").  In chambers before jury selection, Hunt made reference to "my [previous] objection [that] we're allowing . . . all the other acts that were occurring."  At sidebar before Hunt's opening statement, the court noted that a limiting instruction concerning acts occurring in other states

would be available to him at the appropriate time and outlined its content; Hunt

said that "[a] limiting instruction would be great, and what you just proposed

would be satisfactory." During the State's direct examination of the victim, the

court gave a limiting instruction consistent with M.R. Evid. 404(b); Hunt agreed

with the instruction as given. In its charge to the jury, the court again gave a

thorough instruction limiting the jury's use of evidence of conduct occurring in

other states, to which Hunt had no objection.

> [¶53] Thirty-seven years ago, we noted that we have

> long recognized that evidence of prior or subsequent acts similar to the charged offense is admissible for any permissible purpose other than to prove the character of the defendant to show that he acted in conformity therewith. For more than a century our case law has declared that evidence of a defendant's prior or subsequent sexual relations with a victim is admissible to show the relationship between the parties or the intent of the defendant.

> That long and unbroken line of precedents is still valid today under the Maine Rules of Evidence . . . .

*State v. DeLong*, 505 A.2d 803, 805 (Me. 1986) (citations and quotation marks

omitted).

[¶54] Given our jurisprudence, the trial court's repeated limiting

instructions, and Hunt's acknowledgment that the instructions were correct,

the record reveals no error in the court's admission for a permissible purpose

of the evidence of Hunt's out-of-state conduct.

### 4. Communication with the Victim's Mother

[¶55] In chambers before jury selection, the State asked for a ruling in limine to exclude communications between Hunt and the victim's mother that Hunt asserted would establish that the victim's mother was "very angry" with him in 2012—after he moved out and before the victim's initial disclosure—and so would establish a motive for the victim to lie. The court ruled that Hunt would have to establish that the victim knew her mother was angry with him before the communications could be used for that purpose.

[¶56] When Hunt suggested that evidence of "positive interactions" between him and the mother was inconsistent with how the mother would act if she believed he had sexually assaulted her daughter, the State argued that the door would then be opened to evidence of domestic violence in the relationship "and the power and control that would then affect that relationship moving forward." The court deferred a final ruling and Hunt told the court that "the last thing I want to do is open the door." The victim later testified that she was not aware of any interaction between her mother and Hunt between 2012 and 2017.

[¶57] Hunt acknowledges that he "eventually succumbed to not admitting the photos and texts [exchanged with the victim's mother], because

the [c]ourt implied it would open the door to claims of domestic violence by [Hunt] against [the victim's mother]," a question the court had deferred ruling upon. We have said that "the fact that the trial court has acted on a motion in limine does not relieve counsel of making objections at the appropriate points in the trial in order to make a record and preserve points of error for appeal. . . . [Application of] this principle . . . triggers the more deferential standard of review associated with unpreserved claims of error . . . ." *State v. Sykes*, 2019 ME 43, ¶ 13, 204 A.3d 1282 (alterations, citation, and quotation marks omitted).

[¶58] During the trial, the court rejected the State's assertion that the door had been opened to evidence of domestic violence by Hunt's questioning of the victim on cross-examination. Because the court's final ruling on the related question of whether that door would have been opened had Hunt attempted during the trial to admit evidence of his communications with the victim's mother is unknown, the court's in limine ruling, left unchallenged once the trial began, does not constitute clear error or an abuse of discretion. *See Hinkel*, 2017 ME 76, ¶ 7, 159 A.3d 854.

The entry is:

Judgment affirmed.

32

_____

Verne E. Paradie, Jr., Esq. (orally), Lewiston, for appellant David P. Hunt Jr.

Katherine E. Bozeman, Asst. Dist. Atty. (orally), and Katherine M. Hudson-MacRae, Asst. Dist. Atty., Androscoggin County District Attorney's Office, Lewiston, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket number CR-2018-09
FOR CLERK REFERENCE ONLY